[No. S158007. Feb. 4, 2010.]

LORRAINE STEINHART, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES, Defendant and Respondent.

1300

## COUNSEL

Terran T. Steinhart for Plaintiff and Appellant.

Susan D. Blake and Thomas N. Hudson for State Board of Equalization Members Bill Leonard and Michelle Steel as Amici Curiae on behalf of Plaintiff and Appellant.

Trevor A. Grimm, Jonathan M. Coupal and Timothy A. Bittle for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Stephen H. Bennett, in pro. per., as Amicus Curiae on behalf of Plaintiff and Appellant.

Raymond G. Fortner, Jr., County Counsel, and Richard E. Girgado, Deputy County Counsel, for Defendant and Respondent.

Edmund G. Brown, Jr., Attorney General, David S. Chaney, Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, Gordon Burns, Deputy State Solicitor General, and William L. Carter, Deputy Attorney

General, for California State Board of Equalization as Amicus Curiae on behalf of Defendant and Respondent.

Richard E. Winnie, County Counsel (Alameda), Claude F. Kolm, Deputy County Counsel; Robert A. Ryan, Jr., County Counsel (Sacramento) and Thomas R. Parker, Deputy County Counsel, for California State Association of Counties and California Assessor's Association as Amici Curiae on behalf of Defendant and Respondent.

Raymond G. Fortner, Jr., County Counsel, and Albert Ramseyer, Deputy County Counsel, for Rick Auerbach, Los Angeles County Assessor, as Amicus Curiae on behalf of Defendant and Respondent.

Michael V. Strong, in pro. per., as Amicus Curiae.

## OPINION

**CHIN, J.**—Article XIII A of the California Constitution (article XIII A), which the voters adopted in June 1978 as Proposition 13, limits the ad valorem tax on real property to 1 percent of the property's "full cash value." (Art. XIII A, § 1, subd. (a).) As relevant here, section 2, subdivision (a), of article XIII A (sometimes hereafter section 2, subdivision (a)), defines "full cash value" as the 1975–1976 assessed value of the property adjusted for inflation, or the appraised value of the property upon a "change in ownership" occurring after the 1975–1976 assessment. The issue this case presents is whether a "change in ownership" occurred within the meaning of this section upon the death of a trust settlor who transferred her residence to a trust that was revocable during her life, who was the sole present beneficiary of that revocable trust, and who provided in the trust document that upon her death the trust would become irrevocable and her sister would have the right to occupy the residence during her lifetime. Preliminarily, we must determine whether the settlor's surviving sister properly filed this action to challenge an administrative determination that a change in ownership occurred. The Court of Appeal here held that the surviving sister properly filed the action and that no change in ownership occurred. For reasons set forth below, we reverse the Court of Appeal's judgment.

### Factual Background[1]

During her lifetime, Esther Helfrick established a revocable trust, made herself trustee and sole present beneficiary of the trust, and transferred to herself as trustee her residence in Sherman Oaks, California. The trust became irrevocable upon Helfrick's death on March 24, 2001. At that time, under the terms of the trust, Helfrick's sister, plaintiff Lorraine Steinhart, received the right to occupy and use the residence "for so long as she lives," provided she pay all taxes, insurance, and assessments on the property and the costs of utilities and any necessary repairs. Upon Steinhart's death, the trustees of the trust were to sell the residence and disburse the net proceeds to those specified in the trust instrument, i.e., Helfrick's siblings still living at the time of Steinhart's death and the still-living issue of any deceased siblings.

When Helfrick died, the residence's assessed value for tax purposes was $96,638, with total taxes due of $1,105.79. Upon her death, defendant County of Los Angeles (County) reassessed the residence and increased its valuation for tax purposes to $499,000. It then issued a prorated supplemental tax bill for the 2000–2001 tax year in the amount of $1,085.19. For the next three tax years, the County sent property tax bills of, respectively, $5,492.67, $5,764.45, and $6,245.33. Pursuant to the terms of the trust, Steinhart paid these bills.

On July 24, 2004, Steinhart filed a claim with the Los Angeles County Auditor-Controller (County Auditor) seeking a tax refund of $18,587.64.[2] In stating the reasons for her refund claim, she asserted that when she received a life estate interest in the residence, no "change in ownership" occurred within the meaning of section 2, subdivision (a), to trigger reassessment.

Steinhart later received five letters from the County Auditor relating to the challenged tax bills, each dated March 2, 2005, and each stating: "The County has completed its review of your claim(s) for refund of taxes and/or penalties you filed with us on DECEMBER 21, 2004. [¶] Your claim(s) was reviewed by the ASSESSOR. Based on the documentation you submitted, they [sic] determined that your claim does not meet the provisions in the

---

[1] Because this appeal challenges a judgment of dismissal entered upon the sustaining of a demurrer without leave to amend, we draw the operative facts from the complaint. (*Stephenson v. Drever* (1997) 16 Cal.4th 1167, 1170, fn. 1 [69 Cal.Rptr.2d 764, 947 P.2d 1301].)

[2] The complaint states that Steinhart filed the refund claim on April 4, 2004. The written claim, which is attached to the complaint, indicates that Steinhart signed the claim on July 24, 2004. A handwritten note on the claim appears to indicate that the claim was "mailed 8-4-04." The Court of Appeal opinion states that Steinhart filed the claim on July 24, 2004. The precise date is immaterial.

Revenue and Taxation Code for granting a refund. For this reason, your claim(s) for refund is denied effective March 2, 2005. [¶] Section 5141 of the State of California Revenue and Taxation Code allows you six months from the effective date of denial of your claim(s) to commence an action in the Superior Court to seek judicial review of this denial. Should you have any questions or need further assistance regarding this claim please contact the Los Angeles County Property Tax System at (888) 807-2111 and press 1 for the OFFICE OF THE ASSESSOR." Steinhart also received a letter from the County Assessor (Assessor) dated March 3, 2005, stating that the reappraisal would "stand" because "[t]he real property transfer is a 'Change in Ownership', as defined by law." The letter provided the name and telephone number of a person Steinhart could contact "[i]f [she] ha[d] questions." At the bottom, it also included the following: "NOTICE: This notice is your record of our action on your request for investigation. It is your responsibility to pay all billed tax installments. Disputes involving the assessed value of your property should be formally addressed to the Assessment Appeals Board at (213) 974-1471. If we have indicated that a correction is being made, you have 60 days from the date of your corrected tax bill to file an appeal."

Steinhart did not pursue the matter with the Los Angeles County Assessment Appeals Board (Assessment Appeals Board). Instead, on August 29, 2005, she filed an action against the County in superior court contesting the reassessment. She alleged that the County had erred in denying her refund claim because, under the terms of the trust, no change in ownership occurred upon Helfrick's death to trigger reassessment under section 2, subdivision (a). By way of relief, Steinhart sought recovery of the excess real property taxes she had paid on the residence for the years in question. She also requested "a declaration that pursuant to the terms of the trust instrument, no change [in] ownership occurred as of the date of [Helfrick's] death, and hence, defendants were not legally authorized to tax the residence based on a reevaluation of the property as of the date of [Helfrick's] death."

The County responded by way of demurrer, asserting that the complaint failed to state a cause of action for the following reasons: (1) Steinhart did not exhaust her administrative remedies before filing suit; (2) under Revenue and Taxation Code section 60,[3] which defines a "change in ownership" as "a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest," the transfer of a life estate to a nonspouse third party constitutes a change in ownership under section 2, subdivision (a); and (3) the court lacked power to issue the requested order for declaratory relief, because the requested order would, in violation of section 4807, prevent or enjoin the collection of the tax. In opposition to the demurrer, Steinhart argued the

---

[3] All further unlabeled statutory references are to the Revenue and Taxation Code.

following: (1) because her claims present no issues of fact, and the reassessment is a nullity as a matter of law, she was not required to exhaust her administrative remedies; (2) the County is estopped from invoking the exhaustion doctrine, because the denial letters she received from the County led her to believe the next step in the review process was the filing of an action in superior court within six months of the County's denial; (3) under *Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155 [2 Cal.Rptr.2d 536, 820 P.2d 1046] (*Pacific Southwest*), no change in ownership occurred upon Helfrick's death; and (4) section 4807 is inapplicable because the complaint seeks a refund of paid taxes, not a prohibition against collection of future taxes. After hearing, the trial court sustained the demurrer without leave to amend, dismissed the complaint with prejudice, and ordered entry of judgment for the County.[4]

On Steinhart's appeal, the Court of Appeal reversed. For two reasons, it first rejected the County's reliance on the exhaustion doctrine: (1) Steinhart's claims present pure questions of law, not factual issues regarding the property's valuation; and (2) the futility exception to the exhaustion requirement applies given the County's "unyielding position," both in the trial court and on appeal, that a change in ownership occurred.[5] The court next rejected the County's reliance on section 4807, finding the statute inapplicable because Steinhart is seeking not to enjoin collection of future taxes, but to obtain a refund of taxes she has already paid. In other words, she is seeking a judicial declaration "only in aid of obtaining a refund, i.e., a ruling from the court to the effect that no change in ownership occurred and therefore the County was not authorized to reassess the subject real property." On the merits, the court, relying on our decision in *Pacific Southwest*, found that no change in ownership occurred upon Helfrick's death. In reaching this conclusion, the court expressly disagreed with the decision in *Leckie v. County of Orange* (1998) 65 Cal.App.4th 334 [76 Cal.Rptr.2d 426], which reached a different conclusion on analogous facts after finding the relevant discussion in *Pacific Southwest* to be dicta.

We then granted the County's petition for review.

### DISCUSSION

As noted above, the County raises both procedural and substantive issues in opposition to plaintiff's refund claim. We begin with the procedural issues: whether plaintiff failed to exhaust her administrative remedies and, if so, whether that failure bars her action.

---

[4] The trial court's order did not specify the basis of its ruling. The transcript of the demurrer hearing suggests the court agreed with both the County's procedural (exhaustion) and substantive (change in ownership) arguments.

[5] The court did not address Steinhart's estoppel argument.

## I. *Exhaustion of Administrative Remedies*

■ Article XIII of the California Constitution (article XIII), which addresses taxation, specifies that "[t]he county board of supervisors, or one or more assessment appeals boards created by the county board of supervisors, shall constitute the county board of equalization for a county." (Art. XIII, § 16.) It further provides, with exceptions not applicable here, that "the county board of equalization . . . shall equalize the values of all property on the local assessment roll by adjusting individual assessments." (*Ibid.*) As our courts have observed, in view of these provisions, a county board of equalization "is a constitutional agency exercising quasi-judicial powers. [Citation.]" (*International Medication Systems, Inc. v. Assessment Appeals Bd.* (1997) 57 Cal.App.4th 761, 766 [67 Cal.Rptr.2d 394]; see also *Maples v. Kern County Assessment Appeals Bd.* (2002) 96 Cal.App.4th 1007, 1013 [117 Cal.Rptr.2d 663] ["as a board of equalization," county assessment appeals board "is a constitutional agency exercising quasi-judicial powers delegated to it by the California Constitution"]; *Shell Western E & P, Inc. v. County of Lake* (1990) 224 Cal.App.3d 974, 979 [274 Cal.Rptr. 313] [while sitting as a board of equalization, county board of supervisors is a constitutional agency exercising quasi-judicial powers delegated to the agency by the Constitution].)

■ Article XIII also specifies that "[t]he Legislature shall pass all laws necessary to carry out [article XIII's provisions]." (Art. XIII, § 33.) Pursuant to this constitutional command, the Legislature has statutorily established a three-step process for handling challenges to property tax assessments and refund requests. The first step is the filing of an application for assessment reduction under section 1603, subdivision (a), which provides: "A reduction in an assessment on the local roll shall not be made unless the party affected or his or her agent makes and files with the county board [of equalization] a verified, written application showing the facts claimed to require the reduction and the applicant's opinion of the full value of the property." The second step, which occurs after payment of the tax, is the filing of an administrative refund claim under section 5097, subdivision (a), which provides in relevant part that "[n]o order for a refund . . . shall be made, except on" the timely filing of a verified claim for refund. By statute, an application for assessment reduction filed under section 1603 "also constitute[s] a sufficient claim for refund under [section 5097] if" it states that it "is intended to constitute a claim for refund. If [it] does not so state, [the applicant] may thereafter and within the [specified time] period . . . file a separate claim for refund of taxes extended on the assessment which the applicant applied to have reduced pursuant to [s]ection 1603 . . . ." (§ 5097, subd. (b).) The third and final step in the process is the filing of an action in superior court pursuant to section 5140, which provides that a person who paid the property tax may bring an action in superior court "against a county or a city to recover a tax which the board of supervisors of the county or the city council of the city has refused

to refund on a claim filed pursuant to Article 1 (commencing with Section 5096) of this chapter." A court action may not "be commenced or maintained . . . unless a claim for refund has first been filed pursuant to Article 1 (commencing with Section 5096)." (§ 5142, subd. (a).)

■ As our prior decisions establish, "the general rule" in California is that "a taxpayer seeking judicial relief from an erroneous assessment must . . . exhaust[] his remedies before the administrative body empowered initially to correct the error. [Citations.]" (*Security-First Nat. Bk. v. County of L. A.* (1950) 35 Cal.2d 319, 320 [217 P.2d 946] [holding that failure to apply to board of equalization for correction of allegedly erroneous assessment precludes action for recovery of taxes].) In the property tax context, application of the exhaustion principle means that a taxpayer ordinarily may not file or pursue a court action for a tax refund without first applying to the local board of equalization for assessment reduction under section 1603 *and* filing an administrative tax refund claim under section 5097. (*Stenocord Corp. v. City etc. of San Francisco* (1970) 2 Cal.3d 984, 986–990 [88 Cal.Rptr. 166, 471 P.2d 966] (*Stenocord*); *Georgiev v. County of Santa Clara* (2007) 151 Cal.App.4th 1428, 1434–1435 [60 Cal.Rptr.3d 752].)

Our prior decisions also establish that, for purposes of the exhaustion requirement, the filing of a refund claim under section 5097 generally does *not* excuse a taxpayer's failure *first* to file with the local board of equalization an application for assessment reduction under section 1603.[6] For example, in *Stenocord*, after receiving a notice of tax deficiency and demands for payment, the plaintiff, without applying to the local board of equalization for review, paid the taxes, filed a refund claim with the board of supervisors and, upon the claim's rejection, filed a court action for recovery of the taxes paid. (*Stenocord, supra,* 2 Cal.3d at pp. 986–987.) Applying the general rule that "a taxpayer seeking relief from an erroneous assessment must exhaust available administrative remedies before resorting to the courts" (*id.* at p. 987), we held that the plaintiff's failure to seek review before the board of equalization barred the plaintiff's refund action (*id.* at pp. 987–990). In reaching this conclusion, we rejected the plaintiff's contention that its filing of a refund

---

[6] Thus, Steinhart errs in asserting that "[p]roceeding under the refund procedure appears to be an alternative method to proceeding under the equalization method [where] taxes have been illegally assessed or levied." Section 5097, subdivision (b), constitutes further proof of Steinhart's error, by providing, as already noted, that an application for assessment reduction filed under section 1603 "also constitute[s] a sufficient claim for refund" if it states that it "is intended to constitute a claim for refund," and that if it does not so state, the applicant may "thereafter," i.e., after applying for assessment reduction, "file a separate claim for refund of taxes extended on the assessment which the applicant applied to have reduced . . . ." (See also § 5097, subd. (a)(3)(A) [time for filing a refund claim depends on whether the taxpayer's application for assessment reduction "state[s]" that it "is intended to constitute a claim for a refund"].)

claim with the board of supervisors satisfied the exhaustion requirement. (*Id.* at p. 990; see also *Plaza Hollister Ltd. Partnership v. County of San Benito* (1999) 72 Cal.App.4th 1, 34 [84 Cal.Rptr.2d 715] ["refund process" "is distinct from the process of seeking a reduced assessment by filing an application for equalization"]; *Sunrise Retirement Villa v. Dear* (1997) 58 Cal.App.4th 948, 958 [68 Cal.Rptr.2d 416] [failure to file § 1603 application "will usually result in the dismissal of the [refund] suit for failure to exhaust an available administrative remedy"]; *Osco Drug, Inc. v. County of Orange* (1990) 221 Cal.App.3d 189, 193 [272 Cal.Rptr. 14] [discussing "distinction between the reduction in a base-year value [pursuant to § 1603] and a right to a refund of taxes"].)

In this case, it is undisputed that Steinhart skipped step one of the statutory process, i.e., she did not file an application for assessment reduction under section 1603, subdivision (a), with the Assessment Appeals Board, which acts as the County's board of equalization. Instead, she went straight to step two, filing a refund claim with the County Auditor. She argues, however, that for three reasons she may proceed with her lawsuit notwithstanding her failure to apply for assessment reduction. Relying on *Stenocord* and *Star-Kist Foods, Inc. v. Quinn* (1960) 54 Cal.2d 507 [6 Cal.Rptr. 545, 354 P.2d 1] (*Star-Kist*), she first asserts that because her claim involves no disputed facts regarding valuation and presents a "pure question of law"—whether there was a change in ownership within the meaning of section 2, subdivision (a)— exhaustion of administrative remedies was unnecessary. She next invokes the so-called "futility exception" to the exhaustion principle, arguing that applying for assessment reduction in this case would have been futile given the County's "steadfast[]" and " 'unyielding' " position "[a]t the trial court level, before the Court of Appeal, and before this Court," that a change in ownership occurred here. Third, and finally, she argues that the County's failure to indicate in any of its correspondence that she had to apply for assessment reduction before seeking judicial relief estops the County from relying on her failure to exhaust administrative remedies. As explained below, none of these arguments has merit.

> A. *Under the governing statutes, Steinhart had to apply for assessment reduction even though her claim presents a pure question of law.*

As noted above, in arguing that exhaustion was unnecessary because her claim presents a pure question of law, Steinhart relies on *Stenocord* and *Star-Kist.* In the latter, the County's assessor, in assessing the taxpayer's leasehold interests, refused to apply a statute requiring certain deductions, believing that the statute was unconstitutional. (*Star-Kist, supra,* 54 Cal.2d at p. 509.) Without applying for assessment reduction, the taxpayer petitioned

the superior court for a writ of mandate ordering the assessor to cancel the assessments and reassess the leasehold interests in accordance with the statute. (*Ibid.*) In disagreeing that the taxpayer's failure to apply for assessment reduction precluded its court action, we first noted that assessment reduction applications had "not been required . . . in certain cases where the facts were undisputed and the property assessed was tax-exempt [citations], outside the jurisdiction [citation], or nonexistent [citations]." (*Id.* at p. 510.) We next explained: "The necessity of [an application for assessment reduction] is properly determined by the nature of the issues in dispute, and not by whether an assessment is attacked in part or in toto. [Citations.] [¶] The only substantive issue in the present case is whether section 107.1 is unconstitutional on its face. As in cases involving only the question whether property is taxable, there is no question of valuation that the local board of equalization had special competence to decide. There is no dispute as to the facts and no possibility that action by the board might avoid the necessity of deciding the constitutional issue or modify its nature. [Citation.] Under the circumstances, therefore, recourse to the local board of equalization was not required before seeking a judicial determination of the constitutionality of section 107.1." (*Id.* at pp. 510–511, italics omitted.) Although rejecting the exhaustion claim, we nevertheless held that mandate relief was unavailable because the taxpayer had a plain, speedy, and adequate remedy at law: "paying its taxes under protest and suing for recovery thereof . . . ." (*Id.* at p. 511.)

Ten years later, in *Stenocord*, we held that a taxpayer's failure to apply for assessment reduction barred the taxpayer's court action for a tax refund, in which the taxpayer alleged that the assessor had improperly found an understatement in the taxpayer's cost of goods. (*Stenocord, supra,* 2 Cal.3d at pp. 986–987.) In reaching our conclusion, we noted that "[a]n exception" to the exhaustion requirement "is made when the assessment is a nullity as a matter of law because, for example, the property is tax exempt, nonexistent or outside the jurisdiction [citations], and no factual questions exist regarding the valuation of the property which, upon review by the board of equalization, might be resolved in the taxpayer's favor, thereby making further litigation unnecessary [citations]." (*Id.* at p. 987.) We found, however, that the exception was inapplicable, notwithstanding the taxpayer's assertion that the assessor lacked statutory authority to reassess the property and that the reassessment was arbitrary and unconstitutional. (*Ibid.*) We explained: "The fact that the assessor erroneously overvalues property which is otherwise subject to tax does not render the assessment a nullity under the foregoing rule, for disputes regarding valuation are within the special competence of the board of equalization. [Citations.] If any question of valuation exists, it would be irrelevant that plaintiff also challenges the assessment as 'arbitrary' or void on constitutional grounds. [Citations.] If prior recourse to the board on the question of valuation might have avoided the necessity of deciding the

constitutional issue, or modified its nature, plaintiff's action was properly dismissed. [Citation.] [¶] It is evident from the face of the complaint that the dispute herein involved a question of valuation which, if submitted to the board of equalization, might have obviated [the taxpayer's] action." (*Id.* at p. 988.)

Steinhart argues that under *Star-Kist* and *Stenocord*, exhaustion was unnecessary here because the assessment is a nullity as a matter of law and there is no question of valuation the Assessment Appeals Board has special competence to decide, no dispute as to the relevant facts, and no possibility that the Assessment Appeals Board's action might avoid the necessity of a court's having to decide the constitutional/statutory interpretation issue, i.e., whether a change in ownership occurred. The County responds that under *Stenocord*, because the property here is not tax exempt, nonexistent, or outside the jurisdiction, the assessment is not a nullity as a matter of law and the exception to the exhaustion rule does not apply.

■ We need not choose between these divergent interpretations of our precedents because, as the County alternatively argues, since we issued the cited decisions, the Legislature has expressly and definitively settled the exhaustion question insofar as it involves a challenge to a change in ownership determination. In 1986, the Legislature enacted what is now section 1605.5, subdivision (a), which provides in relevant part: "The county board [of equalization] *shall* hear applications for a reduction in an assessment *in cases in which the issue is whether or not property has been subject to a change in ownership*, as defined in Chapter 2 (commencing with Section 60) of Part 0.5 . . . ." (Added by Stats. 1986, ch. 1457, § 21, p. 5232, italics added.) In detailing the purpose of this section, the relevant legislative history explained: "The law is [currently] unclear if taxpayers can appeal the issue of whether or not there has been a change [in] ownership to either [a county board of equalization or an assessment appeals board]. [¶] This provision requires county boards of equalization and assessment appeals boards to hear change [in] ownership issues." (Assem. Com. on Revenue and Taxation, Analysis of Assem. Bill No. 2890 (1985–1986 Reg. Sess.) as amended Mar. 19, 1986, p. 7.) Thus, section 1605.5, subdivision (a), expressly vests county boards with "jurisdiction . . . to adjudicate change [in] ownership disputes" between assessors and taxpayers and "contemplates" that such disputes will "be resolved by the local appeals board before resort is made to the courts."[7] (*Sunrise Retirement Villa v. Dear, supra,* 58 Cal.App.4th at p. 958.)

---

[7] Although requiring county boards of equalization to hear change in ownership issues in the first instance, the Legislature simultaneously provided that this requirement "shall not be construed to alter, modify, or eliminate the right of an applicant under existing law to have a trial de novo in superior court with regard to the legal issue of whether or not that property has undergone a change in ownership . . . ." (§ 1605.5, subd. (a)(3), as added by Stats. 1986, ch. 1457, § 21, pp. 5232–5233.)

Subsequent legislative developments make crystal clear the Legislature's intent to bar taxpayers from challenging change in ownership determinations in court if they fail *first* to apply to their local board of equalization for assessment reduction, even if their challenge presents a pure question of law involving undisputed facts. In 1992, a bill was introduced in the Legislature that would have conditioned the requirement that a local board of equalization hear a change in ownership dispute "upon [a] request by an applicant" for assessment reduction (Sen. Bill No. 1557 (1991–1992 Reg. Sess.) as introduced Feb. 18, 1992, § 5), and would have specified that, to exhaust administrative remedies with respect to such disputes, taxpayers must merely file a refund claim and need not apply for assessment reduction (*id.*, § 8). According to the legislative history, the bill's proponents argued that "change-[in]-ownership issues, often being issues of law, are not appropriately handled by assessment appeals boards." (Sen. Revenue and Taxation Com., Analysis of Sen. Bill No. 1557 (1991–1992 Reg. Sess.) Apr. 8, 1992, p. 4.) Counties objected to the bill, complaining that taxpayers should not "be able to 'jump over' the assessment appeals board and go directly to court if they thought it would maximize their chances of prevailing." (*Id.* at p. 5.) The bill did not pass.

Instead, the next year, the Legislature passed a new provision expressly confirming "the requirement" that a taxpayer apply for assessment reduction "in order to exhaust administrative remedies," but specifying that the filing with the county board of equalization of a stipulation by the taxpayer and the county assessor "stating that issues in dispute do not involve valuation questions," and the board's "acceptance" of the stipulation ("with or without conducting a hearing"), "shall be deemed compliance with [this] requirement." (§ 5142, subd. (b), as added by Stats. 1993, ch. 387, § 8, p. 2218.) At the same time, the Legislature specified that "[n]othing" in the new provision "shall be construed to deprive the county board of equalization of jurisdiction over nonvaluation issues in the absence of a contrary stipulation." (§ 5142, subd. (c), as added by Stats. 1993, ch. 387, § 8, p. 2218.)[8] These statutes and their legislative history show that the Legislature has made an express and considered decision *not* to eliminate the requirement that taxpayers wanting to contest change in ownership determinations *first* apply for assessment reduction to exhaust their administrative remedies. Accordingly, we need not consider whether a *judicially* declared exception to the exhaustion requirement is warranted under *Star-Kist* or *Stenocord*, which predated the relevant statutes. A contrary conclusion would improperly negate the carefully crafted

---

[8] Subdivision (c) of section 5142 actually states that "[n]othing in *this subdivision* shall be construed to deprive the county board of equalization of jurisdiction over nonvaluation issues in the absence of a contrary stipulation." (Italics added.) However, the subdivision was added at the same time as section 5142, subdivision (b), and it has meaning only if construed to refer to subdivision (b).

statutory scheme the Legislature has, within its *constitutional* authority, put in place. Thus, by failing to apply for assessment reduction, Steinhart failed to exhaust her administrative remedies.[9]

B. *The futility exception to the exhaustion requirement is inapplicable.*

Steinhart alternatively argues that the futility exception to the exhaustion requirement applies given the legal position the County has "steadfastly" asserted "[a]t the trial court level, before the Court of Appeal, and before this Court." In this regard, she echoes the analysis of the Court of Appeal, which explained: "[A]t the trial court level and on appeal, the County continues to assert that as a matter of law, the transfer . . . of a life estate from her late sister constitutes a change in ownership. In view of the County's unyielding position on this legal issue, an administrative challenge by Steinhart certainly would have been futile."

 On the record here, the futility exception is inapplicable. As we have explained, " '[f]utility is a narrow exception to the general rule' " requiring exhaustion of remedies. (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 418 [194 Cal.Rptr. 357, 668 P.2d 664].) The exception applies only if the party invoking it can positively state that the administrative agency has declared what its ruling will be in a particular case. (*Ibid.*)

---

[9] In addition to relying on *Star-Kist* and *Stenocord*, Steinhart complains that because a county board of equalization has two years to act on an application for assessment reduction (see § 1604, subd. (c)), and a taxpayer must institute a civil tax refund action in superior court within six months of a county's denial of a refund claim (see § 5141), an assessment appeals board "could defeat the taxpayer's refund lawsuit merely by waiting until after the six-month period expires to render its final equalization decision." Steinhart is wrong. A taxpayer can easily avoid this problem simply by stating that the application for assessment reduction is intended to constitute a section 5097 refund claim. (§ 5141, subd. (c).) Under these circumstances, the refund claim is not "deemed denied" until "the date the final installment of the taxes extended on such assessment becomes delinquent or on the date the equalization board makes its final determination on the application, whichever is later." (*Ibid.*) More generally, a taxpayer may simply wait to file a tax refund claim until *after* the county's board of equalization finally acts on an assessment reduction application. Under the statutes that governed during the timeframe at issue here, Steinhart would have had four years from the date of each tax payment to file a refund claim with the County. (§ 5097, former subds. (a)(2) & (b), as amended by Stats. 1987, ch. 1184, § 23, p. 4216.) Thus, had she timely filed an application for assessment reduction, even had the Assessment Appeals Board taken two full years to act on that application, Steinhart would still have had ample time to file a refund claim with the County. Under current law, if a taxpayer does not state that the application for assessment reduction is intended to constitute a section 5097 refund claim, after a county assessment appeals board finally acts on the application, the taxpayer has one year to file a refund claim if the county's written notice of its decision "does not advise the [taxpayer] to file a claim for refund" (*id.*, subd. (a)(3)(A)), and six months if the notice *does* advise the taxpayer to file such a claim "within six months of the . . . final determination" (*id.*, subd. (a)(3)(B)).

Applying these principles, in *George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1985) 40 Cal.3d 654, 662–663 [221 Cal.Rptr. 488, 710 P.2d 288], we refused to apply the futility exception where nothing in the record indicated that, "at the time that a request for [administrative] review would have been timely, the [administrative agency] had predetermined its position as to" the issue in question. Similarly, nothing in the record here indicates that, *at the time an application for assessment reduction would have been timely*, the Assessment Appeals Board had predetermined its position as to whether a change in ownership had occurred.[10] Contrary to Steinhart's argument and the Court of Appeal's analysis, the position the County took in the *subsequent court action* Steinhart filed is insufficient alone to invoke the futility exception.[11] Thus, the futility exception does not apply to excuse Steinhart's failure to file an application for assessment reduction.

### C. *The County is not estopped from relying on Steinhart's failure to exhaust remedies.*

Reviving an argument the Court of Appeal did not address, Steinhart argues that the notices she received from the County regarding her refund claim estop the County from relying on her failure to exhaust her administrative remedies by applying to the Assessment Appeals Board for assessment reduction. She relies principally on the five notices from the County Auditor, all dated March 2, 2005 (March 2 notices), which stated in relevant part: "The County has completed its review of your claim(s) for refund of taxes and/or penalties you filed with us on DECEMBER 21, 2004. [¶] Your claim(s) was reviewed by the ASSESSOR. Based on the documentation you submitted, they [*sic*] determined that your claim does not meet the provisions in the Revenue and Taxation Code for granting a refund. For this reason, your claim(s) for refund is denied effective March 2, 2005. [¶] Section 5141 of the State of California Revenue and Taxation Code allows you six months from the effective date of denial of your claim(s) to commence an action in the Superior Court to seek judicial review of this denial." From this language, Steinhart argues, "[i]t appeared that the 'County' had spoken, and its word

---

[10] Notably, Steinhart does not assert that she declined to apply for assessment reduction because she knew or suspected the Assessment Appeals Board would deny her request. Rather, in her brief, she concedes she simply *overlooked* the requirement, explaining that when she filed her lawsuit, she was "ignorant" of the requirement that she apply to the Assessment Appeals Board for assessment reduction, and that she "first became aware" of section 1605.5 only "[u]pon review of [the] County's demurrer papers filed in the Superior Court."

[11] Regarding futility, Steinhart does not, and the Court of Appeal did not, rely on the administrative denial of Steinhart's refund claim. Nor could they, given that, as already explained, the statutory scheme *requires* a taxpayer to file *both* an application for assessment reduction *and* a separate refund claim, unless the application for assessment reduction expressly states that it is intended to constitute a claim for refund (§ 5097) or a stipulation "stating that issues in dispute do not involve valuation questions" is filed with and accepted by the county board of equalization. (§ 5142, subd. (b).)

was that [her] claim had been denied, and pursuant to the applicable claim for refund statutory scheme, she had six months in which to commence an action in the Superior Court." Moreover, Steinhart asserts, nothing in these notices or in the notice from the Assessor dated March 3, 2005 (March 3 notice), "advised" her "that she should have proceeded by a request for equalization under Section 1601 . . . rather than a claim for refund under Section 5096," or that "prior to filing her action in the Superior Court within six months of the denial of her [refund] claim, she must first seek equalization by the Assessment Appeals Board." Estoppel applies, Steinhart contends, because "in filing her civil action . . . without first" applying for assessment reduction, she "relied on the advice given by [the] County" in these notices.

■ As we have explained, "[t]he doctrine of equitable estoppel is founded on concepts of equity and fair dealing." (*Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264].) "The essence of an estoppel is that the party to be estopped has by false language or conduct 'led another to do that which he [or she] would not otherwise have done and as a result thereof that he [or she] has suffered injury.' [Citation.]" (*State Compensation Ins. Fund v. Workers' Comp. Appeals Bd.* (1985) 40 Cal.3d 5, 16 [219 Cal.Rptr. 13, 706 P.2d 1146].) The doctrine "ordinarily will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy. [Citations.]" (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 793 [72 Cal.Rptr.2d 624, 952 P.2d 641].)

■ On the undisputed facts here, Steinhart's estoppel argument fails as a matter of law. (See *Cal. Cigarette Concessions v. City of L. A.* (1960) 53 Cal.2d 865, 868 [3 Cal.Rptr. 675, 350 P.2d 715] (*Cal. Cigarette*) ["When . . . the facts are undisputed, the existence of an estoppel is a question of law."].) As we long ago explained in *McKeen v. Naughton* (1891) 88 Cal. 462, 467 [26 P. 354], " 'in order to work an estoppel,' " a representation " 'must generally be a statement of *fact*. It can rarely happen that the statement of a proposition of law will conclude the party making it from denying its correctness, except when it is understood to mean nothing but a simple statement of fact.' [Citation.]" In *McKeen*, we applied this principle to reject the claim that a party's opposition to a motion to dismiss an appeal for lack of jurisdiction estopped the party from later arguing that the judgment rendered upon that appeal was void for lack of jurisdiction. We explained: "Every fact in connection with the attempted taking of the appeal was within the knowledge of the [party who moved for the appeal's dismissal], and being chargeable with a knowledge of the law, neither he nor the appellant here, who stands in his place, can be heard to say that he was *deceived* by any contention of the [party who opposed the appeal's dismissal] in [the earlier] action, as to the *law* governing appeals from justices' courts, and involved in the decision of that motion." (*Ibid.*) Similarly, in this case, every *fact* in

connection with Steinhart's challenge to the County's reassessment was within Steinhart's knowledge. Indeed, Steinhart does not identify any *fact* that was unknown to her; instead, she asserts she was ignorant of the *law* that required her to apply to the Assessment Appeals Board for assessment reduction before filing a refund action in court, and she claims the County's letters misled her regarding this legal requirement.

█ It is also significant that Steinhart, in filing and pursuing her tax refund claim, was represented by counsel.[12] In general, the law "particularly" disfavors estoppels "where the party attempting to raise the estoppel is represented by an attorney at law." (*Kunstman v. Mirizzi* (1965) 234 Cal.App.2d 753, 757 [44 Cal.Rptr. 707].) For purposes of analyzing estoppel claims, attorneys are "charged with knowledge of the law in California." (*Tubbs v. Southern Cal. Rapid Transit Dist.* (1967) 67 Cal.2d 671, 679 [63 Cal.Rptr. 377, 433 P.2d 169] [rejecting claim of estoppel to assert statute of limitations].) Moreover, Steinhart's counsel concedes that before filing this action in court on Steinhart's behalf, he actually "read . . . the applicable claim for refund statutory scheme." Then, as now, that statutory scheme included section 5142, subdivision (b), which, as already explained, expressly references "the requirement that" the taxpayer "appl[y] for reduction under Chapter 1 (commencing with Section 1601) of Part 3 in order to exhaust administrative remedies."[13] Steinhart's counsel also concedes that before filing this action, he read our decision in *Pacific Southwest.* There, in recounting that litigation's procedural history, we explained: "Plaintiff paid tax bills pursuant to the increased valuation but applied for a reduction of the assessment, which it later amended into a claim for a refund under Revenue and Taxation Code section 5097, subdivision (b)." (*Pacific Southwest, supra*, 1 Cal.4th at p. 160.) As already explained, section 5097, subdivision (b), provides a taxpayer with two ways to file a proper refund claim: (1) stating in an "application for a reduction in an assessment filed pursuant to Section 1603" that "the application is intended to constitute a claim for refund"; or (2) after applying for assessment reduction, "fil[ing] a separate claim for

[12] In initially applying for a refund, Steinhart submitted a memorandum entitled "Reason For Refund Claim" and signed by Terran T. Steinhart as "Attorney for Claimant." The March 3 notice was addressed to Terran T. Steinhart.

[13] At oral argument, Steinhart's counsel, although confirming he read the statutory scheme governing tax refunds before filing this action, asserted he did not notice section 5142, subdivision (b)'s express reference to the requirement that taxpayers apply for assessment reduction under section 1601 et seq. "in order to exhaust administrative remedies." This assertion does not aid Steinhart, because, absent a confidential relationship, one asserting estoppel must show that in relying on the alleged misrepresentation, he or she "acted as a reasonably prudent person would act, and was not guilty of negligence or carelessness." (*Robbins v. Law* (1920) 48 Cal.App. 555, 562 [192 P. 118].) Thus, Steinhart is wrong in arguing that, "[h]aving read . . . the applicable claim for refund statutory scheme," she was "understandably ignorant" of the requirement that she go to the Assessment Appeals Board before going to court.

refund of taxes extended on the assessment which the applicant applied to have reduced pursuant to Section 1603 or Section 1604." Under the circumstances, Steinhart is clearly chargeable with the knowledge that the law required her to apply to the Assessment Appeals Board for assessment reduction before filing a refund action in court. ■ And, as we long ago explained, one who acts with full knowledge of plain provisions of law and their probable effect on facts within his or her knowledge, especially where represented by counsel, may claim neither ignorance of the true facts nor detrimental reliance on the conduct of the person claimed to be estopped, two of the essential elements of equitable estoppel. (*Cal. Cigarette, supra,* 53 Cal.2d at p. 871.)

■ Finally, it is significant that the notices on which Steinhart bases her estoppel claim were, at most, ambiguous and confusing regarding Steinhart's need to apply to the Assessment Appeals Board for assessment reduction. It is true, as Steinhart observes, that the March 2 notices, after advising that the County Auditor had rejected her refund claims, stated: "Section 5141 of the State of California Revenue and Taxation Code allows you six months from the effective date of denial of your claim(s) to commence an action in the Superior Court to seek judicial review of this denial." However, neither this statement, which simply advised Steinhart of the applicable statute of limitations, nor anything else in the March 2 notices affirmatively represented that there were no other prerequisites to filing a court action or that Steinhart had met all other prerequisites. At best, this is but one *possible* interpretation that *arguably could* be read into the accurate advisement regarding the applicable statute of limitations. (See *Honig v. San Francisco Planning Dept.* (2005) 127 Cal.App.4th 520, 530–531 [25 Cal.Rptr.3d 649] [no estoppel where notice that referred only to statutory filing requirement, and was silent regarding statutory service requirements, did not indicate that timely filing of a petition would be sufficient to obtain judicial review, did not purport to address the requirements for serving the petition, and did not state that failure to comply with any service requirements would be excused]; *Beresford Neighborhood Assn. v. City of San Mateo* (1989) 207 Cal.App.3d 1180, 1186–1187 [255 Cal.Rptr. 434] [same].) It is also true, as Steinhart observes, that the Assessor's March 3 notice, after advising that "[d]isputes involving the assessed value of your property should be formally addressed to the Assessment Appeals Board," stated: "If we have indicated that a correction is being made, you have 60 days from the date of your corrected tax bill to file an appeal." However, like her reading of the March 2 notices, Steinhart's reading of these statements—that the latter "specified the [only] factual circumstances under which review by the [Assessment Appeals] Board was required," and the former "was not relevant" because no correction was being made—is but one *possible* interpretation that *arguably could* be adopted. It is at least equally, if not more, plausible to read the former statement as a

general advisement that all disputes involving the assessed value of property must be brought before the Assessment Appeals Board, and the latter statement as addressing only one kind of dispute subject to this requirement. Of course, Steinhart's disagreement with the Assessor's determination clearly qualified as a "[d]ispute[] involving the assessed value of" the property. That the notices did not clearly indicate Steinhart could file a court action without first taking her dispute to the Assessment Appeals Board weighs against a finding of estoppel. As we have explained, where a party asserts estoppel, "the facts proved must be such that an estoppel is clearly deducible from them. . . . [Citation.] [¶] The representation, whether by word or act, to justify a prudent man in acting upon it, must be plain, not doubtful or matter of questionable inference. *Certainty* is essential to all estoppels. [Citation.]" (*Wheaton v. Insurance Co.* (1888) 76 Cal. 415, 429–430 [18 P. 758].)

Taking all of the circumstances into consideration, we conclude that Steinhart's estoppel claim fails as a matter of law.

II. *There Was a Change in Ownership Within the Meaning of Article XIII A, Section 2, Subdivision (a).*

In the past, we have elected to address the merits of issues that raised "important questions of public policy," despite a party's failure to exhaust administrative remedies. (*Lindeleaf v. Agricultural Labor Relations Bd.* (1986) 41 Cal.3d 861, 870–871 [226 Cal.Rptr. 119, 718 P.2d 106].) Here, the County asks us to reach the change in ownership issue notwithstanding Steinhart's failure to exhaust administrative remedies, and both the parties and numerous amici curiae have fully briefed the issue. Given these circumstances and the importance of the question presented to taxing agencies, state and local governments, and those whose property interests may be subject to taxation, we now address the merits of the substantive issue the parties raise, despite Steinhart's failure to exhaust her administrative remedies. (Cf. *Connolly v. County of Orange* (1992) 1 Cal.4th 1105, 1115 [4 Cal.Rptr.2d 857, 824 P.2d 663] [addressing merits of issue, notwithstanding procedural obstacles, "[b]ecause of the importance of the questions presented in this matter to taxing agencies, local government, and school districts, and the individual and institutions whose property interests may be subject to taxation"].)

■ Regarding that issue, "our task is to effectuate the voters' intent in adopting article XIII A. [Citations.]" (*City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 562 [41 Cal.Rptr.2d 888, 896 P.2d 181].) In performing this task, we look first to the words of the provision in question, giving them their natural and ordinary meaning, unless it appears they were used in some technical sense. (*Ibid.*; see also *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 122 [105 Cal.Rptr.2d 46,

18 P.3d 1198]; *ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859, 865 [210 Cal.Rptr. 226, 693 P.2d 811]; *Board of Supervisors v. Lonergan* (1980) 27 Cal.3d 855, 863 [167 Cal.Rptr. 820, 616 P.2d 802].) " 'The words used in a [constitutional provision] "must be taken in the ordinary and common acceptation, because they are presumed to have been so understood by the framers and by the people who adopted" ' " the provision. (*Kaiser v. Hopkins* (1936) 6 Cal.2d 537, 539 [58 P.2d 1278].)

■ As noted above, the constitutional provision here in question—article XIII A, section 2, subdivision (a)—provides in relevant part that, in applying the 1 percent limit on ad valorem taxes, a property's " 'full cash value' means the county assessor's valuation of real property as shown on the 1975–76 tax bill under 'full cash value' or, thereafter, the appraised value of real property when . . . a change in ownership has occurred after the 1975 assessment." Thus, the substantive question before us is whether a "change in ownership" within the meaning of this provision occurred upon Helfrick's death. For reasons that follow, we hold it did.

■ The starting point for our conclusion lies in the fact that, during her lifetime, Helfrick transferred the residence to a trust of which she was the sole present beneficiary and as to which she held the power to revoke. Under general principles of trust law, trust beneficiaries hold "an equitable estate or beneficial interest in" property held in trust and are " 'regarded as the real owner[s] of [that] property.' " (*Title Ins. & Trust Co. v. Duffill* (1923) 191 Cal. 629, 647 [218 P. 14] (*Duffill*).) The trustee is " 'merely the depositary of the legal title' " to the property (*ibid.*); " 'the legal estate' " the trustee holds " 'is . . . no more than the shadow . . . following the equitable estate . . . .' " (*Id.* at p. 648.) Moreover, "[p]roperty transferred to, or held in, a *revocable* inter vivos trust is deemed . . . the property of the settlor . . . ." (*Zanelli v. McGrath* (2008) 166 Cal.App.4th 615, 633 [82 Cal.Rptr.3d 835], italics added; see also *Arluk Medical Center Industrial Group, Inc. v. Dobler* (2004) 116 Cal.App.4th 1324, 1331–1332 [11 Cal.Rptr.3d 194] ["a settlor with the power to revoke a living trust effectively retains full ownership and control over any property transferred to that trust . . ."].) Any interest that beneficiaries of a revocable trust have in trust property is "merely potential" and can "evaporate in a moment at the whim of the [settlor]."[14] (*Johnson v. Kotyck*

---

[14] A number of California statutes reflect the Legislature's recognition of these principles. (See Prob. Code, §§ 15800 [holder of revocation power, not beneficiary, has rights otherwise afforded beneficiary under California's Trust Law (*id.*, § 15000 et seq.) and is owed duties of trustee], 15801, subd. (a) [holder of revocation power, not beneficiary, has power to consent or withhold consent where beneficiary's consent may, or must, be given before action may be taken], 15802 [holder of revocation power, not beneficiary, shall be given any notice that is to be given to a beneficiary], 15410, subd. (a) [when settlor revokes trust, property shall be disposed of as settlor directs], 16001, subd. (a) [trustee of revocable trust shall follow written directions of holder of revocation power], 16064, subd. (b) [trustee of revocable trust need not

(1999) 76 Cal.App.4th 83, 88 [90 Cal.Rptr.2d 99]; see also *Security First Nat. Bank v. Wellslager* (1948) 88 Cal.App.2d 210, 214 [198 P.2d 700] [settlor with revocation power "retain[s] the power and control of the trust estate and [can] with a stroke of the pen . . . divest[] the beneficiaries of their interest"].) Thus, although transferring legal title to the residence to herself as trustee, Helfrick, as sole trust beneficiary and holder of the revocation power, continued to hold the *entire* equitable estate *personally* and effectively retained *full* ownership of the residence; any interest Steinhart (or her siblings or their issue) had in the residence under the terms of the trust was merely potential, and could have evaporated in a moment at Helfrick's whim. Under these circumstances, it cannot be said that the transfer of bare legal title to Helfrick as trustee constituted a "change in ownership" within the meaning of article XIII A, and no one contends otherwise.

Upon Helfrick's death, the trust became irrevocable and the *entire* equitable estate in the residence, which Helfrick had personally held during her lifetime, *transferred from Helfrick* to Steinhart and her siblings (or their issue) as beneficiaries of the irrevocable trust. (See *Empire Properties v. County of Los Angeles* (1996) 44 Cal.App.4th 781, 787 [52 Cal.Rptr.2d 69] [upon settlor's death, revocable trust became irrevocable and "the full beneficial interests in the property transferred to" the "residual beneficiaries of the trust"].) It is true that, under the terms of the trust, the beneficial estate in the residence was divided among Steinhart, who, as life tenant, held the right to immediate possession, and Steinhart's siblings (or their issue), who held only a remainder interest in any net proceeds that might someday be realized from sale of the residence after Steinhart's death. But that circumstance does not alter the fact that, upon Helfrick's death, the *entire* equitable estate in the residence was *transferred from Helfrick* to, collectively, Steinhart and her siblings (or their issue) as beneficiaries of the irrevocable trust. In other words, upon Helfrick's death, real ownership of the residence—which, as explained above, follows the equitable estate—transferred from Helfrick to Steinhart and her siblings (or their issue) as beneficiaries of the irrevocable trust. For purposes of section 2, subdivision (a), this transfer constituted a "change in ownership" within the common and ordinary understanding of that phrase.[15]

---

report information or account to beneficiary], 18200 [during lifetime of settlor who retains revocation power, trust property is subject to claims of settlor's creditors to extent of revocation power], 19001, subd. (a) [property subject to revocation power at the time of settlor's death is subject to claims of creditors of deceased settlor's estate]; see also *Zanelli v. McGrath, supra*, 166 Cal.App.4th at p. 633 [statutes "recognize that when property is held in [a revocable] trust, the settlor and lifetime beneficiary ' "has the equivalent of full ownership of the property" ' "].)

[15] Because, as earlier explained, the legal title to trust property a trustee holds is " 'no more than the shadow . . . following the equitable estate' " (*Duffill, supra*, 191 Cal. at p. 648), that the legal title Helfrick held as trustee also passed upon her death to successor trustees is of

To the extent the constitutional language, as applied to the facts of this case, is ambiguous, the conclusion that a change in ownership occurred here under section 2, subdivision (a), is consistent with the "interpretive aids" we use to resolve ambiguities in article XIII A's language: the Proposition 13 ballot materials the voters received and contemporaneous constructions by the Legislature and administrative agencies charged with article XIII A's implementation. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 246 [149 Cal.Rptr. 239, 583 P.2d 1281] (*Amador*); see also *City and County of San Francisco v. County of San Mateo*, *supra*, 10 Cal.4th at p. 563.) Regarding the former, in the ballot pamphlet for Proposition 13, the Legislative Analyst explained that under the measure, a property's assessed value "could . . . be increased by no more than 2 percent per year *as long as the same taxpayer continued to own the property*." (Ballot Pamp., Primary Elec. (June 6, 1978) analysis of Prop. 13 by Legis. Analyst, p. 57, italics added.) Here, upon Helfrick's death, when *all* of the beneficial estate in her residence was transferred, Helfrick unquestionably did not "continue[] to own the property." (*Ibid.*) Thus, the explanation the voters received regarding article XIII A's effect fully supports the conclusion that a "change in ownership" occurred here under section 2, subdivision (a), such that the assessed value of the residence could be increased by more than 2 percent.

Likewise supporting this conclusion is the contemporaneous construction of article XIII A by the Legislature and administrative agencies charged with the article's implementation. As our prior decisions explain, the year after article XIII A's passage, the Legislature adopted a statutory framework for implementing it. (See *Pacific Southwest, supra*, 1 Cal.4th at pp. 160–162.) That framework includes section 60, which provides the following "overarching definition" (*Pacific Southwest, supra*, at p. 162) of "change in ownership" under section 2, subdivision (a): "a transfer of a present interest in real property, including the beneficial use thereof, the value of which is substantially equal to the value of the fee interest" (§ 60). Section 61 then elaborates on this definition by setting forth a nonexhaustive list of specific transfers that constitute a "change in ownership, as defined in Section 60," "[e]xcept as otherwise provided in section 62." As here relevant, section 61, subdivision (h), provides that "change in ownership, as defined in Section 60, includes . . . : [¶] . . . [¶] . . . [a]ny interests in real property that vest in persons other than the trustor (or, pursuant to Section 63, his or her spouse) when a revocable trust becomes irrevocable." Complementing this provision, section 62, subdivision (d), provides that a "[c]hange in ownership shall not include: [¶] . . . [¶] . . . [a]ny transfer by the trustor . . . into a trust for so long as (1) the transferor is the present beneficiary of the trust, or (2) the trust is

little significance. (See Cal. Code Regs., tit. 18, § 462.240, subd. (b) ["transfer caused by the substitution of a trustee" does not "constitute a change in ownership"].)

revocable . . . ." The Legislature adopted these provisions upon the recommendation of a task force it specially created to study and implement article XIII A's "change in ownership" provision, section 2, subdivision (a). (*Pacific Southwest, supra,* at p. 161.) In proposing these provisions, the task force explained: "Revocable living trusts are merely a substitute for a will. The gifts over to persons other than the trustor are contingent; the trust can be revoked or those beneficiaries may predecease the trustor. Transfers into trust are not changes in ownership if either: [¶] (a) The trust is revocable, or; [¶] (b) The creator of the trust is its sole beneficiary during his lifetime. [¶] If the trust is revocable it is excluded because the rights conferred are contingent. If the trustor is the sole beneficiary during his lifetime, his retained interest is considered to be 'substantially equivalent in value' to the fee interest in any real property covered by the trust. He is therefore the true owner and the change in ownership does not occur <u>until</u> the property passes to the remaindermen on the trustor's death." (Assem. Com. on Revenue and Taxation, Task Force on Property Tax Administration Rep. (Jan. 22, 1979) p. 43 (Task Force Report).)

The State Board of Equalization, through an implementing regulation, has also expressly addressed section 2, subdivision (a)'s application to transactions involving trusts. That regulation begins by stating a "[g]eneral [r]ule" that, for purposes of section 2, subdivision (a), "[t]he transfer by the trustor . . . of real property into a trust is a change in ownership . . . at the time of the transfer." (Cal. Code Regs., tit. 18, § 462.160, subd. (a).) The regulation then specifies a list of "[e]xceptions" to the general rule—i.e., "transfers" involving trusts that "do not constitute changes in ownership"—including, as here relevant: (1) "[t]he transfer of real property by the trustor to a trust in which the trustor-transferor is the sole present beneficiary of the trust" (*id.,* § 462.160, subd. (b)(1)(A)); and (2) "[t]he transfer of real property . . . by the trustor to a trust which is revocable by the trustor" (*id.,* § 462.160, subd. (b)(2)).[16] Regarding revocable trusts, the regulation further provides that "a change in ownership does occur at the time the revocable trust becomes irrevocable unless the trustor-transferor remains or becomes the sole present beneficiary or unless otherwise excluded from change in ownership." (*Id.,* § 462.160, subd. (b)(2).)

 We generally accord "great weight" to the statutes the Legislature has passed and the regulations the State Board of Equalization has promulgated to implement article XIII A. (*Amador, supra,* 22 Cal.3d at p. 246.) Under both the express language of, and the underlying justification for, section 61, subdivision (h), section 62, subdivision (d), and the administrative

---

[16] Consistent with these provisions, a separate regulation specifies that "[t]he transfer of bare legal title" does not "constitute a change in ownership." (Cal. Code Regs., tit. 18, § 462.240, subd. (a).)

regulation discussed above, it is clear that upon Helfrick's death, a "change in ownership" under section 2, subdivision (a), occurred in this case. Notably, Steinhart does not even argue otherwise, conceding in her brief that under "a literal application of" section 61, subdivision (h)'s language, "a change in ownership occurred" when Helfrick died, "the revocable trust became irrevocable," and her (Steinhart's) "life estate vested."

Instead, Steinhart argues, and the Court of Appeal held, that insofar as these provisions define a "change in ownership" to include the transfer that occurred upon Helfrick's death, they are in conflict with, and therefore trumped by, section 60's superseding general definition of "change in ownership." In making this argument, Steinhart relies on our conclusion in *Pacific Southwest, supra,* 1 Cal.4th at page 169, that the "examples" sections 61 and 62 set forth were intended "to be derivative or explanatory, and not to conflict with section 60's general rule," and that courts "are constrained to avoid" constructions of those sections that "would render meaningless" section 60's "preeminent command." She also relies on our discussion in *Pacific Southwest, supra,* at page 165, of whether a change in ownership occurs under section 2, subdivision (a), upon "the conveyance of fee simple from parent to child subject to the reservation of a life estate." After noting that the Legislature had expressly included such transfers in section 62's list of examples of exempt transfers (via § 62, subd. (e)),[17] we stated: "But even if the Legislature had not done so, reassessment would be barred under the carefully drafted basic test of section 60, not only because the beneficial use would not have transferred, but also because the value of each divided interest in the estate would not approach that of a fee. A purchaser of the reserved estate would be buying a life estate *per autre vie*—a freehold estate, to be sure, but an estate of questionable value because subject to complete defeasance at an unknown time. Rare is the mortgagee willing to lend on the security of an estate so ephemeral. The value of the reversionary or remainder interest would also be reduced because the time of vesting would be uncertain and, depending on the care with which the original conveyance was drafted, the value of the ultimate estate might be less at the time of vesting because of intervening conveyances, creditors' demands, and the like. [¶] By contrast, when the life estate ends and the remainder or reversion indefeasibly vests in the grantees the value of the estate is known and is identical to the value of the fee. It is at that point that a change in ownership has occurred, as

---

[17] Section 62, subdivision (e), provides in relevant part that a change in ownership shall not include "[a]ny transfer by an instrument whose terms reserve to the transferor . . . an estate for life. However, the termination of such . . . estate for life shall constitute a change in ownership, except as provided in subdivision (d) and in Section 63."

the Legislature specifically provided in accord with the task force's recommendation. (§ 61, subd. [(g)].)"[18] (*Pacific Southwest, supra,* at pp. 165–166, fn. omitted.) Based on this discussion, Steinhart argues that "because the value of a life estate is never substantially equal to the value of the fee interest, or alternatively, the value of [her] specific life estate is not[, in light of her age when Helfrick died,] substantially equal to the value of the fee interest in the residence," the transfer here did not satisfy what we have called the "third prong" of section 60—"the value of which is substantially equal to the value of the fee interest." (*Pacific Southwest, supra,* 1 Cal.4th at p. 165.) And, she continues, because section 60 states "the super[s]eding, general test" for a change in ownership, the result it dictates overrides the result dictated by literal application of section 61, section 62, or the relevant administrative regulations.

Steinhart's argument fails for the simple reason that it erroneously focuses only on the interest *Steinhart received,* rather than the total extent of the interest *Helfrick transferred* when the trust became irrevocable. (See *Pacific Southwest, supra,* 1 Cal.4th at p. 164 [§ 60's "third prong" focuses on "the value of the interest transferred"].) As discussed above, at the time of her death, Helfrick *personally* held the *entire* equitable estate in the residence and was regarded as the residence's real owner. Under the terms of the trust, upon her death, Helfrick transferred not just a life estate, but *the entire fee interest*—i.e., the full bundle of rights—to, collectively, Steinhart and her siblings (or their issue). By focusing only on the life estate Steinhart received, Steinhart improperly ignores the fact that Helfrick, who was the sole beneficial owner of the residence before her death, retained *no* interest in the residence after her death. Moreover, because "the value" of the interest Helfrick transferred in toto was "substantially equal to the value of the fee interest," Steinhart's argument that there was no change in ownership under section 60 fails.[19] (Cf. *Auerbach v. Assessment Appeals Bd. No. 1* (2006) 39 Cal.4th 153, 162 [45 Cal.Rptr.3d 774, 137 P.3d 951] [§ 60's general purpose is to ensure that tax reassessment "follows the fee interest or its equivalent value through various changes in ownership"].)

 Although it is linguistically possible to construe the language of section 60 as Steinhart does—i.e., as focusing only on whether the value of the "present interest" transferred "is substantially equivalent to the value of

---

[18] Section 61, subdivision (g), provides that a change in ownership, as defined in section 60, includes "[a]ny vesting of the right to possession or enjoyment of a remainder or reversionary interest that occurs upon the termination of a life estate . . . except as provided in subdivision (d) of Section 62 and in Section 63."

[19] Steinhart does not dispute that the other criteria of section 60's test have been met, i.e., that Helfrick transferred a "present interest in real property, including the beneficial use thereof."

the fee interest," and ignoring the fact that the owner simultaneously transferred all other interests—for several reasons, we decline to do so. First, this construction is not supported by the Task Force Report, which, in discussing section 60's third prong, referred broadly to the value of "[t]he property rights transferred," not to the value of only the present interest transferred.[20] (Task Force Rep., *supra*, at p. 38.) Second, under Steinhart's construction, in certain cases, even though an owner transfers his or her *entire* fee interest in a property, and retains *no* interest of any kind in that property, reassessment would be precluded. In this regard, Steinhart's construction of section 2, subdivision (a), clearly "would defy Proposition 13's mandate that a change in ownership triggers reassessment of California property"[21] (*Pacific Southwest, supra*, 1 Cal.4th at p. 168), and adopting it would contravene the basic rule that requires us to construe statutes, if reasonably possible given their language, to be consistent, not in conflict, with constitutional provisions. (See *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 371 [285 Cal.Rptr. 231, 815 P.2d 304] ["when constitutional provisions can reasonably be construed so as to avoid conflict, such a construction should be adopted"].) Third, by largely negating section 61, subdivision (h), Steinhart's interpretation would contravene another basic rule of statutory construction: insofar as possible, we must harmonize code sections relating to the same subject matter and avoid interpretations that render related provisions nugatory. (See *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]; cf. *Pacific Southwest, supra*, 1 Cal.4th at pp. 169–171 [applying the rule in interpreting §§ 60, 62, subd. (e)].) Here, nothing requires us to adopt Steinhart's construction of section 60. ▌ Because the *entire* equitable estate in the property was transferred upon Helfrick's death, a "change in ownership" occurred within the meaning of section 2, subdivision (a).[22]

---

[20] Regarding section 60, the Task Force Report stated: "[A] change in ownership is a transfer which has all of the following characteristics: [¶] 1. It transfers a present interest in real property; [¶] 2. It transfers the beneficial use of the property; and [¶] 3. The property rights transferred are substantially equivalent in value to the fee interest." (Task Force Rep., *supra*, at p. 38.)

[21] As earlier explained, the ballot pamphlet analysis of Proposition 13 explained that under the measure, property could not be reassessed only "as long as the same taxpayer continued to own the property." (Ballot Pamp., Primary Elec., *supra*, analysis of Prop. 13 by Legis. Analyst, p. 57.)

[22] Under our analysis, we need not address Steinhart's argument that because the value of *only* the life estate she received was not substantially equal to the value of the fee interest, a change in ownership did not occur. Nor need we consider a question the parties and amici curiae discuss: for purposes of section 2, subdivision (a), who, other than Helfrick, is the current owner of the residence. Under the terms of both the trust and Civil Code section 840, it is Steinhart's obligation, as life tenant, to pay the property tax on the residence. Whether a change in ownership would occur should either Steinhart or any of her siblings transfer their interest in the residence is beyond the scope of this case. Finally, in light of our conclusion, we need not consider the County's argument that section 4807 bars Steinhart's request for a

## CONCLUSION

For the reasons discussed above, we reverse the Court of Appeal's judgment and remand the matter for further proceedings consistent with the analysis in this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied March 30, 2010.

---

declaration that because no change in ownership occurred upon Helfrick's death, the County may not tax the residence based on a reassessment as of the date of Helfrick's death.