Filed 11/22/24  Vangsness v. University of Southern California CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| C. THOMAS VANGSNESS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>UNIVERSITY OF SOUTHERN CALIFORNIA et al.,<br><br>    Defendants and Respondents. | B323220<br><br>(Los Angeles County<br>Super. Ct. No. 21STCP00318) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge.  Affirmed.

Hathaway Parker Inc., Mark M. Hathaway, and Jenna E. Parker for Plaintiff and Appellant.

Hirschfeld Kraemer LLP, Reed E. Schaper, and Derek Ishikawa for Defendants and Respondents.

———————————

The University of Southern California (USC or the University) suspended tenured professor C. Thomas Vangsness, Jr. for one semester without pay after finding he engaged in gender-based harassment. Vangsness sought a writ of mandate pursuant to Code of Civil Procedure[1] section 1094.5 to overturn USC's discipline.[2] Among other things, he argued USC did not afford him fair process. The trial court denied Vangsness's petition as to the gender-based harassment, agreeing with USC that Vangsness failed to exhaust administrative remedies before seeking court intervention and, that, in any event, Vangsness received a fair hearing.

Vangsness argues that the trial court erred because he in fact exhausted his administrative remedies or alternatively was excused from doing so. We disagree, and thus affirm.

## BACKGROUND

### A. A Resident Reports Vangsness's Alleged Misconduct

In June 2017, Vangsness had worked for 30 years as an orthopedic surgeon and professor in the orthopedic residency program at USC's Keck School of Medicine. Dr. Marie Dusch was a resident who had completed a 10-week orthopedic sports

---

[1] All unspecified statutory references are to the Code of Civil Procedure.

[2] Vangsness's writ petition also sought to set aside a separate sanction imposed on him relating to academic misconduct. The trial court set aside the academic misconduct findings and the sanction imposed based on them. USC initially appealed that portion of the court's order but later dismissed its appeal. Accordingly, we do not further discuss issues related to the alleged academic misconduct.

2

medicine rotation with Vangsness.  On June 14, 2017, Dusch met with a residency program director, Dr. Daniel Oakes, and told him that Vangsness had made gender-based comments and inappropriately touched her on the cheek.  Oakes reported Dusch's complaint to USC's office of general counsel, and USC's office of equity and diversity (OED) began an investigation.

**B.     The Faculty Handbook**

Before proceeding, we review the portions of the 2017 Faculty Handbook (Handbook) relevant to this appeal.

1.     *USC's Anti-harassment Policy*

Chapter 6 of the Handbook prohibits faculty members from harassing anyone based on a protected characteristic, including gender.  Upon receiving such a harassment complaint, an OED investigator will investigate and make factual findings. Thereafter, a separate individual "determine[s] whether the facts as found show that a violation of [chapter 6] has occurred," and notifies the parties of his or her conclusion and of the procedures for appeal.  Section 6-F (1) requires faculty members to appeal OED findings or conclusions to the vice provost for academic and faculty affairs within five calendar days of being notified of the conclusions.  A copy of the appeal is then "provided to the other party," meaning the complainant, who has five calendar days to reply.

After OED issues its conclusions or after the appeal is resolved (if one is taken), the vice provost determines what sanction to impose.  The Handbook lists several possible sanctions, from mandated training up to "dismissal for cause." Thereafter, the faculty member may file a grievance, which "is the method provided by [USC] to review the decision by the

3

[p]rovost's delegate in appeals as to findings and conclusions" and the sanction decision.

### 2. *Grievance Procedures*

Under chapter 7, "A grievance may be filed for a violation of rights provided by law, or by established University policies including those contained in the . . . Handbook." "The grievant shall be given an opportunity to obtain necessary pertinent witnesses and documentary or other evidence. [USC] shall use its persuasive power and the [h]earing [b]oard its good offices to help the grievant obtain necessary pertinent evidence or witnesses, but [USC] has no obligation to incur undue expense for this purpose." "In considering grievances related to . . . actions under [c]hapter 6, the grievance panel shall not substitute its judgment on the substantive merits of the decision . . . for that of the appropriate faculty body or bodies and administrators."

"All grievance panel decisions are recommendations to the [p]resident of the University." The president "retain[s] ultimate decision-making authority as to all grievances" and has the discretion to reject the grievance panel's recommendation.

## C. Events Leading Up to USC's Final Decision

### 1. *The OED "Summary Administrative Review" Report*

LaNell Shirley, an OED senior compliance investigator, investigated the harassment allegations and detailed her interviews and findings in a "Summary Administrative Review." Shirley interviewed Dusch, Vangsness, and other witnesses. Vangsness admitted to some of the conduct and generally responded that his style of teaching was " 'loose and fun' " and that the complaint was a " 'misunderstanding.' " Vangsness encouraged Shirley to speak with senior resident Dr. Nate

Heckmann and another witness. Shirley spoke with Heckmann, but the other witness did not return her calls.

### 2. *Vangsness Meets with Garner*

On October 27, 2017, Vangsness met with Judy Garner, vice dean for faculty affairs of the medical school. According to Garner's notes, Garner and Vangsness discussed that Vangsness had been interviewed by OED. Garner told Vangsness that "if there was a finding from OED," it "would be brought before a faculty committee where a determination as to whether this amounted to misconduct would be made. [Garner] explained that a second question asked of the committee would be, if they felt that misconduct had occurred, whether that misconduct amounted to a level where consideration of recommendation for dismissal should occur. [She] then went on to say that if they felt it was misconduct but not to the level of dismissal, there were a range of disciplinary actions that could occur that would be decided upon by the provost in consultation with the dean. If consideration of dismissal was recommended, then the . . . [H]andbook process would be followed."

Garner asked Vangsness to provide her with a written statement that could be given to the faculty committee "by Monday." Vangsness responded that "he was leaving for China tonight or early tomorrow" and would not return until November 7, 2017. Garner therefore asked for the statement by November 10, 2017.

### 3. *OED Notice to Vangsness of Its Findings and His Right to Appeal*

Shirley concluded her investigation on October 30, 2017. She found it more likely than not that Vangsness engaged in the harassing conduct about which Dusch complained, as well as

5

making offensive gender-based comments to others besides Dusch.  By an email-delivered letter dated October 30, 2017, Shirley notified Vangsness of her findings, including summaries of the allegations, his response, and relevant witness statements.  For example, Shirley found that Vangsness " '[s]lightly slapped' Dusch on the right cheek in front of a patient and a medical student with enough force that it stung.  [Vangsness] admitted to 'touching' Dusch on the cheek for giving a medical student a hint about an answer to a question that [he] posed to the medical student.  Although [he] described the 'touch' as a 'love tap,' Dusch described the touch as a 'slap' that was 'heavy enough that it kind of stung for a bit.'  Dusch's account was corroborated by another witness who stated that the slap 'wasn't super light' and there 'was a good amount of contact' between [Vangsness's] hand and Dusch's cheek."

The letter further explained that Shirley would forward her findings to John Jividen, who would determine whether the acts violated USC's policy.  She explained that "[i]nformation about filing an appeal, including . . . appeal deadlines, can be found in [s]ection 6-F (1) of the . . . Handbook."  She invited Vangsness to provide to her with any further information relevant to the investigation or contact her if he had questions.

By a memorandum to Vangsness dated October 31, 2017, Jividen concurred with Shirley's findings and concluded Vangsness's actions "[rose] to the level of a policy violation," because they "f[e]ll under the definition of [h]arassment [b]ased on a [p]rotected [c]haracteristic" as described in the Handbook.  The memorandum provided, "Procedures for appeal of findings may be found in [s]ection 6-F (1) of the . . . Handbook."  It further provided that the matter was being referred to the office of the

6

provost for disciplinary action. Vangsness acknowledged that he received Shirley's letter and Jividen's memorandum on October 30 and 31, 2017, respectively, although he was in China on those dates. Vangsness did not file an appeal within the five-day period, nor did he provide a statement to Garner, as she had requested, by November 10, 2017.

4. *Interim Sanctions*

By a letter dated November 22, 2017, then-interim dean of the medical school, Laura Mosqueda, informed Vangsness that as a result of the OED findings regarding harassment, as well as findings of academic misconduct not at issue in this appeal, USC had temporarily removed his teaching assignments and adjusted his clinical responsibilities to "limit [his] contact with residents."

5. *Vangsness's December 1, 2017 Letter*

Vangsness submitted a letter dated December 1, 2017, to Mosqueda and Garner challenging USC's findings. He argued that OED's investigation had been inadequate, described his version of the incidents (which was substantially similar to what he had previously told Shirley), and requested a hearing at which he could cross-examine Dusch and present witnesses. Vangsness did not offer any explanation or apology for the tardiness of his letter.

6. *USC Issues a Sanction Decision*

By a letter dated December 21, 2017, vice provost Martin L. Levine informed Vangsness of his sanction decision concerning the gender-based harassment. He stated that OED "investigated [Vangsness's] actions, found the facts, and concluded that [he had] violated the [U]niversity['s] policy . . . . [He] did not appeal the findings or conclusions to the provost's designee under . . .

Handbook [section] 6-F (1)." Levine explained that he considered "the seriousness of the offense and all the circumstances," and "[t]hat there were multiple offenses was an exacerbating circumstance." USC suspended Vangsness without pay for one semester, during which time USC relieved him of all duties, prohibited him from seeing patients, practicing medicine, and coming to campus, and required him to complete certain training programs. The letter notified Vangsness that he could file a grievance within 10 days and that "[g]rievances concern violation of rights provided by law, [USC's] policies, or a faculty contract. The Handbook states that no other USC entity except OED, or the provost's delegate on an appeal, reaches factual findings and conclusions on whether there has been a violation of our equity and diversity policies, and that therefore a grievance panel shall not substitute its judgment on the substantive merits of the decision."

7. *Proceedings Related to Vangsness's Grievance Filing*

a. Vangsness Files a Grievance

On January 4, 2018, Vangsness filed a grievance. He amended his grievance on April 4, 2018. Vangsness explained the context for each of the gender-harassment incidents of which Dusch had complained and argued there was no profanity or sexuality to his remarks or actions. However, he acknowledged his comments had been inappropriate.

b. Correspondence Prior to the Grievance Hearing

Sometime between January 4 and February 13, 2018, Vangsness sent an undated letter to vice provost Elizabeth Graddy. He requested that Graddy accept his correspondence "as reaffirmation of [his] December 1, 2017 request for an appeal under section 6-F (1) of the . . . Handbook." He argued his appeal

8

was timely because he provided it five business days after November 22, 2017, the date Mosqueda first informed him that USC was taking corrective action against him. He did not state that his trip to China had prevented him from appealing the OED findings earlier. He claimed USC would not suffer prejudice in hearing his appeal because his grievance hearing had not started.

On February 13, 2018, Graddy emailed Vangsness that USC had considered his December 1, 2017 letter before issuing sanctions. Graddy declined to construe Vangsness's December 1, 2017 letter as an appeal of the OED findings and conclusions, noting Vangsness had not complied with section 6-F because he did not direct his letter to her and provided it well past the five-day deadline for an appeal.

c.     <u>Grievance Hearing Briefs</u>

On March 14, 2019, Vangsness filed his grievance hearing brief. He argued that, among other things, USC's procedures lacked due process. Vangsness also submitted the declaration of former Keck School of Medicine dean Carmen Puliafito, who declared he never observed or heard about Vangsness acting inappropriately. Puliafito believed the sanctions imposed on Vangsness were "inconsistent with the history and prior practices of USC" and were "an unsupported effort to force [Vangsness] from [USC]."

USC argued that Vangsness failed to appeal the OED findings and conclusions as the Handbook required. As a result, his grievance hearing was limited to whether Levine, in imposing sanctions, violated Vangsness's rights.

In a supplemental brief, Vangsness asserted that he "attempted to appeal the [OED] findings, but his appeal was

9

rejected on the basis that it was late and sent to the wrong person." He blamed his failure to appeal on USC, saying he "had been misled by Professor Garner, who had told him to provide her with the information and she would convene a faculty committee as 'part of his due process.' . . . [H]e was sanctioned without any due process or hearing."

### d. The Grievance Hearing

Vangsness's grievance hearing proceeded over two days, March 22 and October 15, 2019, before a panel of three USC faculty members. Both parties were represented by counsel. Upon invitation by the panel to explain the process, USC's counsel stated the panel was to consider whether "there is a violation of rights under the [H]andbook or law." On the first day, six witnesses, including Oakes, Puliafito, Jividen, and Garner testified.

During Garner's testimony, Vangsness's counsel asked her, "[I]f you told Dr. Vangsness that there would be a faculty committee after the OED, is it possible that you might have made him think that he would have an opportunity at a later time . . . to participate in that faculty committee and raise issues that he thought were important in consideration of his case?" Garner responded that she did not tell Vangsness that he would have such an opportunity.

Vangsness testified on October 15, 2019. He stated that as a result of his meeting with Garner, he understood a committee would be formed and that he would have the opportunity to personally present his position and evidence to the committee before any finding was made. During his testimony, Vangsness asserted for the first time that his being in China prevented him from exercising his right to appeal.

8.  *The Hearing Panel Recommends USC Deny Vangsness's Grievance and USC's President Agrees*

In the grievance panel's report to the president of USC, Carol L. Folt, the panel explained that although the grievance procedure was not to review the factual findings, most of Vangsness's presentation was directed at challenging those findings.  The report emphasized, "Our charge did not include a re-assessment of the evidence used in . . . the OED investigation."  The hearing panel found, "the [U]niversity and its employees followed all protocols as outlined by the . . . Handbook . . . .  There was no evidence that . . . Vangsness's rights were violated.  The panel believed that the sanctions were in line with previous sanctions and were not excessive.  Therefore, the grievance was not supported."

USC provided the panel's report and recommendations to the parties and notified them that they had two weeks to provide an additional statement to Folt.  On January 30, 2020, Vangsness and USC submitted statements to Folt.  Among other things, Vangsness argued that he was not afforded due process because he was not provided with a hearing and an opportunity to question witnesses.

On May 21, 2020, Folt issued her final decision, accepting and approving the hearing panel's recommendation that Vangsness's grievance be denied.  She explained "if our university is going to have female trainees, we cannot have a senior professor acting toward them like women don't really belong in the profession, nor engaging in an offensive touching such as slapping them on the cheek."  She also observed Vangsness did not file a timely appeal to the provost's designee.

11

**D.    Vangsness's Petition for Writ of Mandate**

1.    *The Parties' Arguments*

On February 3, 2021, Vangsness filed a petition for writ of mandate in the superior court.  He argued USC[3] did not provide him with a fair hearing because, among other things, he was not given access to evidence, a live hearing, or an opportunity to cross-examine witnesses or present evidence.  He argued that USC's findings were not supported by the evidence and that the sanctions were overly harsh.  He further argued that because he was on a trip in China, he could not exercise his right of appeal within five days of receiving the OED's conclusions.

USC's opposition argued Vangsness's petition should be denied because he failed to exhaust his administrative remedies by failing to timely appeal the OED findings and determination against him.  USC further argued that its procedures were in any event fair.  USC notified Vangsness of the complaints against him.  Vangsness had an opportunity to speak to an unbiased OED investigator.  OED provided Vangsness detailed written findings and an opportunity to appeal them.  USC argued neither a live hearing nor cross-examination was required.  Further, the evidence was largely undisputed and supported USC's decisions and sanctions.

In reply, Vangsness argued his December 1, 2017 letter should have been considered an appeal of the OED findings and conclusions because, among other things, Garner gave him

_____

[3] Vangsness brought his petition against USC and Folt, "in her official capacity as [p]resident of [USC]."  However, the parties do not distinguish between USC and Folt in their arguments, treating them both as "USC."

12

conflicting information about the procedures that led him to believe he would have had an opportunity to appear before a faculty committee to present his position. He also argued USC's ultimate decision that the OED proceedings were fair demonstrated that appealing the OED findings and conclusions would have been futile.

### 2. *The Trial Court's Ruling*

On July 7, 2022, the trial court heard the parties' arguments. It thereafter denied Vangsness's petition as to the gender-based harassment. It concluded that Vangsness failed to exhaust administrative remedies when he did not timely and properly appeal OED's factual findings and conclusions. As a result, he "waived any argument that could have been made in the OED appeal, specifically 'whether the conclusions are supported by the findings, and the findings are supported by the evidence in light of the whole record, and whether there were procedural errors that had a material impact on the fairness of the investigation.' " It also found that Vangsness did not identify or discuss any legal theory, such as estoppel, relating to the conflicting information from Garner that could plausibly excuse the appeal deadline, nor did he establish futility in exhausting the administrative remedies. Nonetheless, the trial court then proceeded to conduct a lengthy analysis of the fairness of the OED procedures, concluding Vangsness received a fair hearing, that the sanctions were not excessive, and that Vangsness failed to show prejudice from the errors he claimed.

13

## DISCUSSION

### A.  General Legal Principles and Standard of Review

Section 1094.5 sets out the procedure for judicial review of a final administrative determination by writ of mandate. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 810.)  The remedy of administrative mandamus applies to determinations by private organizations "made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer." (§ 1094.5, subd. (a); see *Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1729, 1730 [applying § 1094.5 to administrative proceeding at a private university].)

Generally, the exhaustion of administrative remedies is a jurisdictional prerequisite before one can resort to the courts, and not a matter of judicial discretion.  (*Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 496.)  The requirement that a petitioner must first exhaust their administrative remedies applies to section 1094.5 proceedings. (E.g., *California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464, 1485 [citing multiple authorities that so hold].)  " 'The exhaustion doctrine is principally grounded on concerns favoring administrative autonomy (i.e., courts should not interfere with an agency determination until the agency has reached a final decision) and judicial efficiency (i.e., overworked courts should decline to intervene in an administrative dispute unless absolutely necessary).' [Citation.]  ' "Even where the administrative remedy may not resolve all issues or provide the precise relief requested by a plaintiff, the exhaustion doctrine is still viewed with favor

14

'because it facilitates the development of a complete record that draws on administrative expertise and promotes judicial efficiency.' " ' [Citation.]" (*McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 275.) "Until an available 'administrative procedure has been invoked and completed, there is nothing that the . . . court may review . . . .' [Citation.] For that reason, 'the failure to exhaust administrative remedies prevents [the] appellant from seeking relief through administrative mandamus (. . . § 1094.5), which provides judicial review of *final* administrative proceedings.' [Citation.]" (*Ibid*.)

The exhaustion doctrine has exceptions. (*City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 609.) "For example, it does not apply . . . when it is clear that seeking administrative remedies would be futile [citation]." (*Ibid*.) Nor does it apply where the agency's affirmative conduct caused the petitioner's failure to exhaust administrative remedies. (*Shuer v. County of San Diego* (2004) 117 Cal.App.4th 476, 486 ["a government entity will be estopped from asserting as a defense a failure to exhaust administrative remedies when a government agent has negligently or intentionally caused a party to fail to comply with a procedural precondition to recovery"].)

"We review the denial of [a] petition for a writ of mandate on the ground of failure to exhaust administrative remedies under different standards depending on the basis of that decision. We exercise independent review over questions of law such as the interpretation of applicable statutes or codes and whether the [d]octrine applies in a given case; we apply the substantial evidence test to factual matters concerning what a party did or did not do." (*SJCBC LLC v. Horwedel* (2011) 201 Cal.App.4th 339, 345.)

15

**B.     Vangsness Did Not Exhaust His Administrative Remedies**

Vangsness argues he exhausted his administrative remedies through his December 1, 2017 letter. We disagree that the December 1, 2017 letter constituted an appeal under USC's procedures. USC's Handbook provided Vangsness with an opportunity to appeal OED's findings and conclusions. USC informed him twice—once on October 30, and again on October 31, 2017—that he could appeal and that the procedures for appeal could be found in section 6-F (1) of the Handbook. Those procedures required Vangsness to submit his appeal to the vice provost for academic and faculty affairs within five calendar days of being notified of OED's conclusions, i.e., November 5, 2017.

It is undisputed that Vangsness did not comply with these appellate procedures. He did not submit an appeal by November 5, 2017, upon his return from China on November 7, 2017, or even on November 10, 2017, the deadline Garner had given him to explain his version of events. Instead, he first contested the OED's determinations weeks later, on December 1, 2017. Nor did he direct his December 1, 2017 letter to the vice provost. Rather, he waited until sometime after January 4, 2018 to contact vice provost Graddy and request that she retroactively consider his December 1, 2017 letter an appeal. Vangsness argues USC should have elected to consider his untimely letter as an appeal. He cites no authority for the proposition that an agency must consider an untimely appeal or one that does not

otherwise comply with the agency's procedures.[4] As USC was not required to consider Vangsness's untimely appeal, its refusal to do so did not constitute a waiver of its right to require Vangsness to exhaust his administrative remedies before seeking court review.

Vangsness alternatively argues he exhausted administrative remedies through the grievance process. However, the grievance process is not a substitute for an appeal to the provost's office. An appeal to the provost's office permits reconsideration of any factual findings. Grievance proceedings, on the other hand, do not provide an opportunity for USC to reconsider the evidence or whether it sufficiently supported OED's determination—a remedy that Vangsness now seeks through court process. Chapter 6 of the Handbook explained that in the case of harassment, grievance proceedings offer a review of the provost's delegate's appeal decision or of USC's sanction decision. The Handbook clarifies, "In considering grievances related to . . . actions under [c]hapter 6, the grievance panel shall not substitute its judgment on the substantive merits of the decision . . . for that of the appropriate faculty body or bodies and

---

[4] Vangsness urged USC to consider his late-filed appeal not because of any difficulties posed by his China trip; he instead simply claimed USC would not suffer prejudice if it considered his purported appeal. However, USC's appellate deadline was not important only to bring finality to its administrative proceedings for the University, but also for the complainant, Dusch. Those procedures required Dusch to respond to Vangsness's appeal within five days of receiving it. Having never received such an appeal within the proper timeframe, she was entitled to believe that USC's factual inquiry had concluded and to move on with her life.

17

administrators." Because Vangsness did not exhaust his administrative remedies related to such factual questions, he cannot now seek court review of them.

## C. Vangsness Is Not Excused from Exhausting Administrative Remedies

Vangsness next argues that even if he did not exhaust administrative remedies, he was excused from doing so. He makes two arguments in this regard. First, he contends that USC should be equitably estopped from asserting an exhaustion of remedies defense because Garner knew he was in China when OED issued its determination and because Garner misled him to believe that he did not need to file an appeal. Second, he argues he was excused from exhausting administrative remedies because doing so would have been futile.

"Certain conditions are necessary as the basis for an estoppel: the party to be estopped must be apprised of the facts; the other party must be ignorant of the true state of the facts; the party to be estopped must have intended that its conduct be acted upon, or so act that the other party had a right to believe that it was so intended; and the other party must rely on the conduct to its prejudice." (*Cal. Cigarette Concessions v. City of L.A.* (1960) 53 Cal.2d 865, 869.) Further, "absent a confidential relationship, one asserting estoppel must show that in relying on the alleged misrepresentation, he or she 'acted as a reasonably prudent person would act, and was not guilty of negligence or carelessness.' [Citation.]" (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1316, fn. 13.)

Vangsness does not explain how the fact that Garner knew he was in China when OED issued its findings and conclusions meets the elements of estoppel. Indeed, it was not until October

18

2019, nearly two years after the appeal deadline had lapsed, that Vangsness first claimed that his trip to China had prevented him from submitting a timely appeal, but even then, he never explained to USC how the trip prevented him from doing so. There is no evidence in the record that Vangsness's trip affected his ability to follow the Handbook's procedures in appealing the OED's findings and conclusions.  Vangsness does not argue that he did not receive OED's findings and conclusions when they were sent, on October 30 and 31, 2017.  To the contrary, in his letter to Graddy, Vangsness acknowledges, "On October 30, 2017, I received a letter from . . . Shirley."  "The next day, I received a letter from . . . Jividen."  Each of those letters explained that Vangsness could appeal OED's determinations and that section 6-F (1) of the Handbook described the process for appeal. Vangsness argues USC should have provided additional details about the appeal procedures in those letters, but he does not cite any authority that indicates USC was required to do so and the Handbook provisions clearly set forth the appellate process.  Nor does Vangsness offer evidence that he did not have email access, requested but was denied an extension, sought but could not obtain access to the Handbook, or that he promptly provided a statement upon his return from China.  To the contrary, even upon his return from China, Vangsness was dilatory, waiting weeks to submit a written statement contesting the OED's conclusions.

Vangsness also argues USC should be equitably estopped from asserting an exhaustion of remedies defense because Garner told him, " 'that if there was a finding from OED,' the matter 'would be brought before a faculty committee where a determination as to whether this amounted to misconduct would

19

be made.' " He asserts he relied to his detriment on this representation, "trusting that a hearing would be held without a further requirement that he act to appeal the OED findings or initiate such hearing."

However, Vangsness fails to show that he acted as a reasonably prudent person in relying on Garner's representation in the way he claims he did. (See *Steinhart v. County of Los Angeles, supra,* 47 Cal.4th at p. 1316, fn. 13.) Garner's description did not include details about the OED process, did not purport to discuss appellate rights, did not represent that Vangsness could appear before a faculty committee, and did not state the faculty committee would reconsider factual findings made by OED. After this conversation, OED notified Vangsness that it had concluded that he violated USC policy, that his remedy was to appeal, how he needed to go about appealing, and that the matter was being referred to the vice provost's office for discipline—all without the matter going before a faculty committee. Thus, Vangsness was on written notice about details of the process (including the applicable Handbook rules) that Garner had not discussed, and that governed the appeal of OED factual findings. In these circumstances, a reasonably prudent person would inquire into the OED procedures and deadlines rather than rely on a vague oral description of the process contradicted by two written notices and cited Handbook provisions.[5]

---

[5] Vangsness also argues that even if he wanted to appeal, he was not given a copy of Shirley's administrative summary review, and thus did not have "the evidence on which such an appeal would reasonably be based." This ignores that Shirley

20

Vangsness's futility argument fares no better. "[T]he futility exception is very narrow and will not apply unless the petitioner can positively state that the administrative agency has declared what its ruling will be in a particular case." (*Bollengier v. Doctors Medical Center* (1990) 222 Cal.App.3d 1115, 1126.) Vangsness argues only that the grievance panel's and Folt's decision as well as "[r]espondents' [o]pposition [b]rief all demonstrate that appealing the OED findings and conclusions would have been futile, as USC's position is that the OED investigation/adjudication was fair and did not violate [his] rights." However, he does not cite anything in the record that demonstrates that before Vangsness's time to appeal had expired, USC had indicated that an appeal would not change its findings. That USC decided the OED's investigation and findings were fair after Vangsness failed to avail himself of an appeal does not establish that USC had predetermined that it would not change its findings.

---

verbally advised him of the allegations against him and he admitted to some of the conduct although he sought to provide context for what occurred. Moreover, Shirley's October 30, 2017 letter detailing her findings stated the factual basis for them, including whether he admitted to the conduct and what she learned from witnesses that was relevant to her findings.

## DISPOSITION

We affirm the trial court's judgment.  USC is awarded its costs on the appeal filed September 6, 2022.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

BENDIX, Acting P. J.

KLATCHKO, J.*

---

* Judge of the Riverside County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.