Filed 3/26/26  Scott v. Marin County Assessment Appeals Bd. CA1/4

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHELLY SCOTT, as Marin County Assessor, etc.,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>MARIN COUNTY ASSESSMENT APPEALS BOARD,<br><br>　　Defendant and Respondent;<br><br>MICHAEL DAY et al.,<br><br>　　Real Parties in Interest and Appellants. | A171613<br><br>(Marin County<br>Super. Ct. No. CV0000809) |

In this administrative mandate proceeding, Michael Day and Laura Allen (Real Parties) appeal from the trial court's issuance of a writ to the Marin County Assessment Appeals Board (Board) ordering vacatur of the Board's ruling in their favor.  The central issue is whether, for assessment purposes under Revenue and Taxation Code section 69.5, the Real Parties are entitled to transfer to their present residence (Property) the base-year value of a residence Day previously owned.  The trial court granted writ relief to the Marin County Assessor (Assessor), but remanded for further administrative proceedings.

1

What complicates the Revenue and Taxation Code section 69.5 issue here is that the Real Parties entered into an agreement October 29, 2018 with Allen's mother, Kathleen Burry, two days before the Property's purchase on October 31, 2018, and under a co-ownership agreement (the Co-Ownership Agreement or the Agreement), Burry, as trustee for the Kathleen Burry Revocable Trust, is the record title holder and borrower for the Property. The Board decided that, regardless of Burry's status as record title holder, the Real Parties hold a beneficial ownership in the Property, and as a result, they are the owners of the Property and are entitled to a base-value transfer. The Board found by clear and convincing evidence "that the legal title holder, Ms. Burry, intended to and did transfer all beneficial ownership of the Property to [the Real Parties]."

In support of her writ petition, the Assessor argued and the trial court agreed that the Board's decision was erroneous because Burry could not effect a transfer of the beneficial interest in the Property via the Co-Ownership Agreement two days *before* her purchase of the Property, since California law requires that she hold a *present* interest in real property in order to transfer it. But despite having so ruled, the trial court did not rule outright for the Assessor. It remanded for consideration of an issue the court viewed as unaddressed by the Board—the Real Parties' argument that they obtained beneficial ownership of the Property not via a transfer from Burry, but because Burry acted solely as their agent in arranging the Property's purchase.

Here on review, the Real Parties contend there was no need for a remand to the Board. In their view, they should win outright because the Board *did* address the agency issue, it correctly decided the issue in their favor, and we should now endorse that ruling. Rather than address this

2

argument, defend the trial court's decision on the merits, and grapple directly with the agency issue, the Assessor's brief in response argues only that the Real Parties have appealed from an interlocutory, nonappealable order. We reject that procedural argument. Because the trial court granted the writ without retaining jurisdiction or reserving any issues for the court's further consideration, we conclude the Real Parties seek review of a final, appealable order.

On the merits, however, we reverse because the premise of the trial court's ruling is legally incorrect. As noted, the court granted writ relief on the ground that a base-year transfer requires the transfer of a present interest, and Burry could not transfer beneficial ownership of the Property to the Real Parties before purchasing it because she had nothing to transfer when the Co-Ownership Agreement was signed. But in so ruling, the court focused on the wrong date. The issue here is not whether, *as of October 29, 2018*, when the Co-Ownership Agreement was signed, Burry transferred anything to the Real Parties; instead what matters is whether, under the Co-Ownership Agreement, *as of October 31, 2018* Burry was obligated to, and did, transfer to the Real Parties beneficial ownership of the Property (with record title to be transferred later as soon as the Real Parties completed their divorce proceedings and obtained their own financing).

Given this error, we must reverse because the trial court remanded to the Board for further proceedings "consistent with" its unqualified order granting the writ, which, naturally, may lead the Board to feel compelled to accept the erroneous premise on which the remand order is based, potentially foreclosing further review of the order Real Parties now place before us for review in the event the Assessor prevails in further proceedings before the Board. The trial court did, however, correctly see the need for the Board to

3

more fully address the agency issue, particularly since the Real Parties have staked their position on that issue all along.

The Real Parties insist that there is no need for an administrative remand because, according to them, the Board has already decided the agency issue in their favor. We conclude that, if the Board's decision addresses the agency issue, it does so incompletely on the present record. It is unclear, for example, whether a series of apparently inaccurate representations by Burry to Wells Fargo (the Property's mortgage lender)—representations that seem to have been known to the Real Parties—may render the Co-Ownership Agreement unenforceable on public policy grounds. By raising this aspect of the agency issue, we do not intend to suggest in any respect how we might rule on it. We simply flag the matter of enforceability so that, at the conclusion of the proceedings before the Board, and in any further writ proceedings before the trial court, or eventually before this court, the record will be adequate for review.

## I. BACKGROUND

In June 2020, Day applied to the Assessor for the application of the base-year value of a residence he previously owned to the Property for assessment purposes. The Assessor denied his application because, the Assessor concluded, "you are not the owner of the [Property], nor is the [P]roperty eligible for the homeowners' exemption. (See Rev. & Tax Code § 69.5(b)(4).)"

### A. *The Board Proceedings*

#### 1. Day's Contentions Before the Board

Day appealed the Assessor's denial of his request for application of the value transfer to the Board. The Assessor conceded at the Board hearing that as long as one owner of the Property qualified for the transfer, the transfer was potentially applicable. In a letter brief to the Board, Day,

4

through his attorney, argued that the Property was eligible for the base-year value transfer and addressed the issue upon which the Assessor based her denial: whether the Real Parties were the true owners of the Property.

Day asserted that he and Allen, soon to be married, had sought to replace Day's previous residence with a new one and needed financing to do so. But Day "was in the process of finalizing a divorce, and under the divorce proceeding [Day] was not allowed to incur new debt without his soon to be ex-wife signing paperwork to authorize the new debt. [Day's] ex[-wife] was unwilling to sign off on [Day] obtaining a new loan."

Unable to obtain financing, Day further asserted, the Real Parties asked Burry, Allen's mother, to effect purchase of the Property on the Real Parties' behalf as their agent and temporarily hold record title. Burry, a certified public accountant and partner in an accounting firm, agreed. The three entered into the Agreement two days before the purchase of the Property, which the attorney attached to his letter. The Agreement, executed by the Real Parties and Burry on October 29, 2018, begins with a series of recitals. Among these recitals are the following statements of fact and intention:

The Real Parties "are a couple in an exclusive, domestic relationship," with "each of them . . . going through a divorce with another individual," who "wish to purchase a house together in which to reside, i.e., the Property." Burry "has agreed to obtain financing in her name . . . , purchase the Property in her name, and hold record title to the Property only temporarily until such time as [the Real Parties] complete their divorce proceedings, refinance the Property by obtaining conventional financing in their names, and receive record title from [Burry] simultaneously with a full and complete payoff of [Burry's] Loan . . . ." It "is the Parties' intention for [Burry] to never

5

have any true ownership (or any other) rights whatsoever with respect to the Property; she will only hold record title temporarily pursuant to the terms of this Agreement in order to facilitate a pathway toward home co-ownership by [the Real Parties]." Further, "100% of all expenditures related to the Property (including . . . purchase funds, loan payments, repairs, maintenance, insurance, property taxes, utilities, etc.) have been, and will continue to be, paid by [the Real Parties] pursuant to the terms hereof, with [Burry] having contributed no funds towards/regarding the Property."

The Agreement then sets out seven pages of provisions. These repeat the recitals regarding Burry's limited role, refer to ownership interests in the Property that the Real Parties would hold, and provide for what would occur in the event Real Parties ended their domestic partnership and/or either of them wished to sell or transfer his or her interest in the Property. The Agreement further provides that "[o]nly [the Real Parties] shall have the right to occupy the Property," that "no other adult shall occupy the Property without the unanimous agreement of [the Real Parties]," and "[t]he Property, and any interest therein, may be rented, leased, sold, assigned, encumbered, or otherwise conveyed only by [the Real Parties'] unanimous signed written agreement." The Agreement makes clear that the Real Parties were responsible for "all mortgage payments, property taxes, insurance premiums, maintenance costs, utilities, services, and other expenses associated with the Property," and were to receive any income derived from the Property and any proceeds from the Property's sale. Nothing in the Agreement provides that Burry would ever hold anything more than record title in the Property.

The Agreement also provides, "No Party hereto . . . is authorized to act as agent or on behalf of any other Party, to do any act which will be binding on any other Party, or to incur any expenditures with respect to the Property,

6

*except as may be specifically provided in this Agreement*." (Italics added.) In the letter brief to the Board, Day characterized Burry as the Real Parties' "agent" who purchased the Property on their behalf pursuant to the terms of the Agreement. Burry agreed with that reading of the Agreement's terms. She submitted a declaration attached to the letter brief stating, "I assisted my daughter Laura Allen and her soon to be husband Michael Day acquire the [Property] by serving as an agent for them. I contributed no funds toward the purchase of the Property, and I contributed no funds toward the loan secured by the Property nor any funds for any other expenses of owning the Property. As provided under the [Agreement], I have no ownership interest in the Property."

To acquire the Property, Burry obtained a mortgage loan in her name. The deed of trust securing that loan, signed by Burry, contains a variety of borrower's covenants to the lender, including one entitled "Transfer of the Property or a Beneficial Interest in Borrower[,]" which states, inter alia, that "[i]f all or any part of the Property or any interest in the Property is sold or transferred . . . without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument." And in a Rider to the deed of trust, also signed by Burry, the borrower agrees that she "shall occupy" the Property for her second home and that she commits to "keep the Property available for [her] exclusive use and enjoyment at all times."

Despite these covenants, counsel for Real Parties represented that the lender, Wells Fargo, was aware that, "although Ms. Burry was obtaining the loan in her name, the loan would be paid by [the Real Parties], who would be living in the Replacement Property. . . . Wells Fargo was fully aware that (i) Kathleen Burry was serving as an agent for [the Real Parties], and (ii) [the

7

Real Parties] would be the true owners and occupiers of the Replacement Property." Some purportedly supporting e-mails were attached to the letter brief; one, for example, from a Wells Fargo representative to Burry, Allen, and Day, congratulated "you all" for closing on the Property.

As for the law, Day contended that "Property Tax Rule 462.200(c) recognizes that an agent may hold property for a principal under a holding agreement, and the principal is considered the true beneficial owner of the property." He attached a 2006 letter from counsel for the Board of Equalization indicating that while the tax rules recognized a presumption that a person listed on a deed has a beneficial ownership interest in a property, that presumption could be overcome by evidence. He also cited and attached two past Board of Equalization letters regarding other real property assessment disputes that he contended supported his position.

Day also asserted that the Real Parties had paid for everything regarding the Property, including a $555,000 down payment for its purchase; all loan payments, which totaled over $212,000 in principal and interest; all property taxes and homeowner insurance premiums; all of the maintenance and expenses of home ownership; and $50,000 for improvements and landscaping. They also made property tax and mortgage interest deductions on their tax returns for 2019 and 2020, as indicated by attached itemized deductions portions of their tax returns, property tax bills, and mortgage interest statements.

On the other hand, Day contended, Burry did not contribute any funds toward the Property. As indicated by attached itemized deductions portions of her tax returns for 2019 and 2020, she did not take any deductions for property taxes or mortgage interest expenses for the Property.

8

### a. *The Board Hearing*

The Board held a hearing on Day's appeal in February 2023. Day's attorney repeated many of the contentions and arguments made in the letter brief we have just summarized, and referred to the documents attached to it as well. He added that at the time the Property was purchased, Allen also was in the process of getting a divorce, so could not then obtain a loan, and that the Real Parties were married and lived at the Property with their three children. He confirmed that, as the Assessor had asserted in denying their request, the Property had been refinanced a couple of times with Burry listed as borrower, and contended Burry likely did not know anything about the representations in the refinancing documents that she was the owner of the property. He characterized the Agreement as a holding agreement in which it was agreed that the Real Parties were the true owners of the Property but that Burry held legal title as their agent.

Day testified at the hearing. He said the Property was his only residence and that Burry had never stayed there more than a few nights. Neither he nor Allen was able to incur indebtedness at the time of the Property's purchase because of their divorces, and he had been in an "active divorce" that was "in process" at the time. Also, although the two were divorced at the time of the hearing, title to the Property had not been transferred to them and financing had not been changed because they would have to refinance with a then-existing interest rate that was double what they were then paying—over six percent compared to 2.75 percent. He said Burry agreed that it did not make sense to change their arrangement under those conditions and that their arrangement did not have a particular expiration date.

The Assessor's counsel first noted that the Assessor's office had not previously seen the documents attached to Day's letter brief to the Board. He then contended the base-year value transfer was inappropriate because Burry, as the record title holder, owned the Property, and there was no evidence of the requisite written transfer of any interest in the Property from her to the Real Parties, including in the Agreement. He argued the Agreement was a co-ownership agreement and not a holding agreement between an agent and a principal. Hence, he said, there was no evidence that Day owned the Property, regardless of what he might have paid regarding it. The parties then debated the meaning and significance of the other Board of Equalization letters cited by Day.

The parties and the Board also discussed whether Burry had transferred an ownership interest in the Property to the Real Parties. The Assessor maintained there had to be a written transfer agreement for such a transfer and that none existed. Day's counsel said this transfer question was "a red herring" because no transfer was necessary, since the Real Parties were the principals in the purchase of the Property and Burry merely was their agent. The Board, cognizant that the Assessor's office had not had the opportunity to review the documents submitted by Day and believing the issue before it to be unique, took the matter under submission but allowed the parties to submit supplemental briefs.

b. *The Parties' Supplemental Briefs*

Both Day and the Assessor submitted supplemental briefs. The Assessor maintained that Burry was the owner of the Property and not the Real Parties and that the Agreement did not constitute a holding agreement. She argued, among other things, that the fact that legal title and financing were in Burry's name (as trustee for the Kathleen Burry Revocable Trust)

10

created a presumption under the property tax rules and Evidence Code section 662 that Burry owned the Property.[1]  Although this presumption was rebuttable by clear and convincing evidence, she contended that the Real Parties had failed to rebut it.

In their supplemental brief, the Real Parties continued to argue that, pursuant to the Agreement, they were the "true owners of the Property." They repeated their previous contentions, including that Burry acted merely as their agent pursuant to the Agreement and that, as her principals, they obtained beneficial ownership of the Property upon its purchase.  They also contended that the Assessor, not the Real Parties, had the burden of proof pursuant to a rebuttable presumption in favor of the taxpayer created by Revenue and Taxation Code section 167.

## 2.  The Board's Decision

The Board ruled in a written "Finding of Facts," dated July 13, 2023 in Assessment Board Appeal No 21-0173.  It applied a definition of "change of ownership" based on Revenue and Taxation Code section 60 and section 462.001 of title 18 of the California Code of Regulations.  It concluded that, "[u]nder [Revenue and Taxation Code section 60], there are . . . three elements required to effect a change of ownership:  (1) a transfer of a present interest in real property; (2) a transfer of the property's beneficial use; and (3) a transfer of value substantially equal to the fee interest."  Further, California Code of Regulations, title 18, section 462.001, which implements Revenue and Taxation Code section 60's definition, explicitly includes as a " 'change in ownership' " the transfer of a present right to the beneficial use.

---

[1] Evidence Code section 662 provides:  "The owner of the legal title to property is presumed to be the owner of the full beneficial title.  This presumption may be rebutted only by clear and convincing proof."

11

The Board concluded that this definition applied to evaluating whether the base-year value should be transferred under Revenue and Taxation Code section 69.5.

The Board then turned to the one "factual issue" before it, "whether a present interest in the Property was transferred to [the Real Parties], including beneficial use equivalent in value to a fee interest." It observed that the Real Parties bore the burden of proving they qualified for the value transfer by clear and convincing evidence under Evidence Code section 662 and characterized their position as follows: "[Day] argues that the [Co-Ownership] Agreement, as well as [the Real Parties'] behavior toward the property—paying the down payment, mortgage, taxes, upkeep and occupying it as his residence—constitute clear and convincing evidence that the owner of record on the title, Ms. Burry, transferred a present interest in the property to [the Real Parties], one of whom was her daughter, of a value equivalent to the fee."

Ultimately, the Board sided with the Real Parties, stating it "found credible the testimony and supporting documents which showed by clear and convincing evidence that the legal title holder, Ms. Burry, intended to and did transfer all beneficial ownership of the Property to [the Real Parties]. As credibly explained by Mr. Day at the hearing, Ms. Burry's role was to hold legal title for financing purposes to assist her daughter and Mr. Day purchase a home together. [The Real Parties] paid the down-payment and have been paying the mortgage, taxes and upkeep since Ms. Burry took legal title. Moreover, the Co-ownership Agreement reserves no possessory interest for Ms. Burry. [The Real Parties'] rights are exclusive. They are equivalent to a fee interest in the Property. As such, they are owners for purposes of [Revenue and Taxation Code] Section 69.5. [¶] There being no other factual

12

predicate to the benefit of the dispute, [the Real Parties] are entitled to transfer the base year value of Mr. Day's original property to that of the Subject Property."

### B. *Trial Court Proceedings*

#### 1. The Assessor's Petition for a Writ of Administrative Mandate

The Assessor filed a petition under Code of Civil Procedure section 1094.5 in the Marin County Superior Court for a writ of administrative mandate directing the Board to vacate its decision. The Assessor argued Burry, not the Real Parties, owned the Property, much as she had argued before the Board. The Assessor further argued that the Board erred in basing its decision on the conclusion that Burry transferred the beneficial interest in the Property to the Real Parties at the time they entered into the Co-Ownership Agreement because she did not yet own the Property, and because California law only allows such a transfer of a present interest. She characterized the Co-Ownership Agreement as "at most, . . . an agreement to convey ownership to Real Parties at some later date when Real Parties complete their respective divorce proceedings and obtain financing in their names."

The Real Parties opposed the petition on much the same grounds as those Day presented to the Board and defended the Board's decision as supported by substantial evidence. They continued to contend the evidence showed "that Burry purchased the [P]roperty as the Real Parties' agent, taking title on their behalf and expressly agreeing that all the incidents of actual ownership, including possession and beneficial use, were reserved for Real Parties exclusively under the terms of the [Co-Ownership] Agreement."

#### 2. The Trial Court's Order

The trial court accepted the Assessor's theory that there was a mismatch in the timing of Burry's acquisition of title and the requirement

13

that Burry hold a present interest in order to transfer any such interest. It reasoned as follows:

"The Board's determination that Real Parties own the Subject Property is the result of its finding that Burry, through the Agreement, 'intended to and did transfer all beneficial ownership of the [Subject] Property to [the Real Parties].' As a matter of law, the Agreement could not have effected a transfer of any interest in the Subject Property.

"The Agreement does not contain any language purporting to effect a transfer of interest in property. Instead, it specifies that upon the occurrence of a particular set of events . . . Burry is to take action to cause record title to be transferred to Real Parties 'through an escrow process in which ownership *will transfer*.' ([E]mphasis added.) In other words, the Agreement is . . . merely an agreement to convey property at some time in the future. Such agreements do not themselves convey an interest in real property.

"Also, there is no evidence that Burry even owned the Subject Property at the time she executed the Agreement. Real Parties and Burry executed the Agreement on October 29, 2018. Burry purchased the Subject Property on October 31, 2018. The Court knows of no authority permitting a party to transfer property she does not own.

"Real Parties agree that the Agreement did not transfer ownership of the Subject Property to them from Burry. . . . They argue that no such transfer was necessary, because Real Parties were the true owners of the Subject Property from the moment the Cliffs [the previous owners], ceased to own it.

"But that is not what the Board held. The Board's decision was not merely that Real Parties own the Subject Property, but that Real Parties own the Subject Property because, through the Agreement, 'Ms. Burry[] intended

14

to and did transfer all beneficial ownership of the [Subject] Property' to them. That is the decision the Court has been asked to review." (Fn. omitted.)

The court further concluded that, although Real Parties had "contend[ed] that Burry acquired the Subject Property as their agent and took only bare title, all beneficial use having been reserved for Real Parties under the terms of the Agreement," the Board "did not address the agency argument in its decision. Accordingly, the matter shall be remanded for the Board to address this argument in light of this ruling. (See Code Civ. Proc., § 1094.5, subd. (f).)"

"Accordingly," the trial court continued, "the petition is granted. Let a writ of mandate issue commanding the Board to set aside its decision . . . . The Board is to reconsider the matter in light of the Court's opinion and to take such further action as is specially enjoined on it by law. (Code Civ. Proc., § 1094.5, subd. (f).)" The court did not reserve jurisdiction over anything that might later be decided by the Board on remand or qualify its granting of writ relief in any respect.

Real Parties filed a timely appeal from the trial court's writ.

## II. DISCUSSION

### A. *The Trial Court's Order Is Appealable*

We first address the Assessor's contention that we must dismiss the Real Parties' appeal because it is from an interlocutory, nonappealable order. She bases this argument on the framework established in *Dhillon v. John Muir Health* (2017) 2 Cal.5th 1109 (*Dhillon*) and the holdings in *Jackson v. Board of Civil Service Commissioners of City of Los Angeles* (2024) 99 Cal.App.5th 648 (*Jackson*) and *County of Los Angeles v. Los Angeles County Civil Service Com.* (2018) 22 Cal.App.5th 174 (*County of Los Angeles*).

In *Dhillon*, our Supreme Court set forth the test for determining whether a trial court order in an administrative mandamus proceeding that

15

includes a remand to the administrative body for further proceedings is or is not a final, appealable order. There, John Muir Health (John Muir) required Dhillon, a surgeon with clinical privileges at two hospitals owned by John Muir, to attend an anger management program after he became involved in a dispute with a colleague. (*Dhillon, supra*, 2 Cal.5th at p. 1112.) When he refused to attend, John Muir told him his clinical privileges would be suspended for a period of time. (*Ibid.*) Dhillon requested a hearing before John Muir's judicial review committee, but John Muir replied that he was not entitled to one. (*Ibid.*)

Dhillon then petitioned for a writ of administrative mandate in superior court. (*Dhillon, supra*, 2 Cal.5th at p. 1112.) He contended, among other things, that John Muir had violated its bylaws by disciplining him without a hearing and that those bylaws violate due process. (*Id.* at pp. 1112–1113.) The trial court agreed, directed John Muir to conduct a hearing, and otherwise denied the petition. (*Id.* at p. 1113.) John Muir appealed. (*Ibid.*) The appellate court dismissed the appeal on the ground that the trial court's order was not a final, appealable order. (*Ibid.*)

The Supreme Court, noting "a long-standing conflict" among the appellate courts "concerning the appealability of a trial court's order, on a petition for writ of administrative mandamus, remanding the matter for further proceedings before the administrative body" (*Dhillon, supra*, 2 Cal.5th at p. 1113), held that Dhillon had appealed from a final, appealable order. (*Id.* at p. 1116.) It noted that the trial court had either granted or denied each of Dhillon's claims and had not reserved jurisdiction to consider any issues. (*Id.* at pp. 1116–1117.)

Thus, "as a formal matter, once the trial court issued the writ, nothing remained to be done in that court; no issue was then left for the court's

16

' "future consideration except the fact of compliance or noncompliance with the terms of the first decree." ' [Citations.]" (*Dhillon*, *supra*, 2 Cal.5th at p. 1117.)  Further, "as a practical matter, unless John Muir has a right of immediate appeal, the trial court's interpretation of its bylaws may effectively evade review." (*Ibid*.)  The *Dhillon* court reasoned, "If the administrative proceedings are again ultimately resolved adversely to Dr. Dhillon, John Muir would have no basis for seeking review of the decision.  Thus, if Dr. Dhillon chose not to seek mandamus review, that would be the end of the matter." (*Id*. at pp. 1117–1118.)

Under the rule enunciated in *Dhillon*, an order in an administrative mandamus proceeding that includes a remand for further proceedings should be considered final and appealable when it conclusively decides the issues presented to it, and dismissal of the appeal may leave no "practical" opportunity for review of that decision.  (*Dhillon*, *supra*, 2 Cal.5th at p. 1118, fn. 4.)  Subsequent Court of Appeal decisions illuminate the application of this rule.

In *Jackson*, the City of Los Angeles (City) served Jackson, a detention officer with the Los Angeles Police Department, with notice of a 10-day suspension based on multiple counts after he left his scheduled work shift without notifying his superiors.  (*Jackson*, *supra*, 99 Cal.App.5th at pp. 651–653.)  He appealed his suspension to an administrative board, contending the City had violated procedure required by *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, and that the evidence did not support the allegations.  (*Jackson*, at p. 653.)  The board rejected his contentions, and Jackson petitioned the trial court for a writ of administrative mandate, seeking an order directing the board to set aside its decision and award him backpay because of its procedural violation.  (*Id*. at p. 654.)

17

The trial court granted Jackson's petition in part, directing the board to set aside its decision and determine whether Jackson was entitled to backpay because it had violated the requirements of *Skelly*. It found the evidence supported three of the City's counts and that there was compelling evidence of misconduct regarding the fourth, but remanded the matter to the board to determine if, under one of these counts, the City had prejudicially violated *Skelly* and, regarding the fourth count, if Jackson could be disciplined under the City's jail operations manual. (*Jackson, supra*, 99 Cal.App.5th at p. 654.) The court also ordered the board to reconsider the penalty imposed in light of Jackson's disciplinary history, and authorized the board to take additional evidence as necessary. (*Id*. at pp. 654–655.) Jackson appealed. (*Id*. at p. 655.)

The appellate court, following the *Dhillon* framework, held the trial court's judgment was not a final, appealable judgment. (*Jackson, supra*, 99 Cal.App.5th at p. 655.) While the trial court left nothing for it to determine, it enabled the board upon remand to reconsider the finding on one count, the appropriate disciplinary penalty for all counts, and whether Jackson's *Skelly* rights were violated for one of them. (*Jackson*, at p. 657.) Should the board rule against him, Jackson could file a new or supplemental petition for a writ of administrative mandate. (*Ibid*.) And, crucially, "*as counsel for the Board stipulated at oral argument*, Jackson may challenge the proceedings on remand and any intermediate adverse rulings that necessarily affected the judgment, *including the trial court's order granting in part the first writ petition*." (*Id*. at p. 658, italics added.) Thus, while the court's order was final, the second condition of *Dhillon*—that the trial court's ruling could as a practical matter evade review if the appeal were dismissed—had not been met. (*Jackson*, at p. 658.)

18

Similarly, in *County of Los Angeles*, the trial court partially granted a petition for a writ of administrative mandate by the County, which had discharged Merritt from employment, to the extent that it "remanded the matter to the Commission [the administrative body] with instructions to set aside its decision, make appropriate findings, reconsider the penalty based on those findings, and issue a new decision that includes findings explaining its rationale. The [trial] court explicitly stated its order was interlocutory. It did not require or foreclose any particular decision by the Commission and left for future review by that court the core issue of Merritt's discharge or reinstatement." (*County of Los Angeles*, *supra*, 22 Cal.App.5th at p. 177; see *id.* at p. 176.)

The appellate court, also following *Dhillon*, held that, "[b]ecause the . . . order from which Merritt purports to appeal left the key issues raised by the parties for future resolution by the trial court, and because the propriety of that order is an issue that could be resolved in any future appeal from a final judgment, the order is not a final judgment and is not appealable." (*County of Los Angeles*, *supra*, 22 Cal.App.5th at p. 178.)

Turning to the application of the *Dhillon* rule in this case, the trial court's order and the circumstances here are much more akin to that considered in *Dhillon* than those considered in *Jackson* or *County of Los Angeles*. The trial court's order's finality is obvious; it states without qualification or reservation of any issues that the Assessor's "petition for a writ of administrative mandamus is GRANTED." And the court based its grant on two conclusions.

First, that the Board's stated basis for ruling in the Real Parties' favor, as interpreted by the trial court, that Burry had intended and did transfer a present ownership interest to the Real Parties via the Agreement two days

19

before purchase of the Property, was legally unsupported because under California law she could only transfer a present interest in the Property, i.e., one that she already owned. In reaching this conclusion, which directly addressed the merits of the Board's decision, the court characterized that Agreement as "merely an agreement to convey property at some time in the future."

Second, the court concluded the Board did *not* address in its ruling the Real Parties' agency theory. It remanded the matter for the Board to also address that theory, i.e., whether the Real Parties obtained beneficial ownership of the Property at the time of its purchase under California agency law, but the trial court expressly stated that the Board should "reconsider the matter in light of the Court's opinion."

The court thereby limited the Board's further deliberations to the agency question and required that any ruling be consistent with the court's order. As such, its order could have a meaningful, even determinative impact on the Board's further deliberations. For example, the Board could decide that it was bound under the doctrines of res judicata, collateral estoppel, or law of the case by some aspect of the trial court's order and, based on that, reject the Real Parties' arguments about agency. And this would be particularly troubling in light of our conclusion that the trial court erred in its interpretation of the Board's decision (which we will discuss further shortly).

The court's rulings could evade our review altogether were we to dismiss this appeal. (See *Dhillon*, *supra*, 2 Cal.5th at p. 1118, fn. 4 [noting approvingly that federal courts have held a remand order is appealable when the order is effectively unreviewable after resolution of the merits of the

20

controversy, particularly when " 'the remand order forces the agency to apply a potentially erroneous rule which may result in a wasted proceeding' "].)

As we read the administrative record, the trial court brought a final end to the mandamus proceeding before it upon making a final determination of the issues presented by the Real Parties. Its remand of one issue—the need for express consideration by the Board of the Real Parties' agency theory—did not alter the finality of the remainder of its order.

The Assessor contends that the trial court "expressly reserved deciding . . . the central issue of the case regarding whether Revenue & Taxation Code § 69.5 requires a person to own property within the meaning of that statute," which the Assessor broke down in her petition. This is incorrect. In its order, the court wrote that it "does not reach the Board's legal finding that a person need not hold title to real property to 'own' that property within the meaning of Section 69.5." That is not an express reservation of jurisdiction. Rather, the court was merely indicating it had no need to reach that issue. The court explained, "Regardless of whether Real Parties are legally capable of owning the Subject Property for purposes of Section 69.5 when they are not named on the title, the Board's finding that they *do* in fact own it cannot be sustained because the contract cited as the basis for their ownership could not have conveyed a property interest as a matter of law." And whether or not this issue were to be revisited in a subsequent petition from a Board decision, it would have to be evaluated consistent with the trial court's rulings in the order presently appealed from.

The Assessor also contends that in any event, the Real Parties, should they lose before the Board on remand, may file a refund action under Revenue and Taxation Code section 5140. But any such action would be a separate proceeding, and the Assessor fails to establish that any of the trial

21

court's present rulings could be revisited there (see Code Civ. Proc., § 906 [authorizing on appeal review of any intermediate ruling that involves the merits, necessarily affects the order appealed from, or substantially affects the rights of a party, but "not authoriz[ing] the reviewing court to review any decision or order from which an appeal might have been taken"]).

In short, the trial court issued an order that was, as a practical matter, final and included substantive rulings that could impact the outcome of the matter on remand to the Board and which could evade review. (See *Dhillon*, *supra*, 2 Cal.5th at p. 1118, fn. 4.) We therefore conclude the trial court's administrative writ was a final, appealable order and now proceed to the merits.

## B. *The Trial Court's Order Vacating the Board's Decision Is Based on an Erroneous Interpretation of That Decision*

As we have discussed, the underlying issue on the merits is whether, under Revenue and Taxation Code section 69.5, the Real Parties are entitled to have the base-year value of a residence previously owned by Day transferred to their present residence (Property) for assessment purposes, even though, pursuant to an agreement they entered into with Allen's mother, Kathleen Burry, two days before purchase of the Property (Co-Ownership Agreement), Burry (as trustee for the Kathleen Burry Revocable Trust) is the record title holder and borrower for the Property.

The Board ruled the Real Parties were entitled to the base-year value transfer because clear and convincing evidence showed "that the legal title holder, Ms. Burry, intended to and did transfer all beneficial ownership of the Property to [the Real Parties]. As credibly explained by Mr. Day at the hearing, Ms. Burry's role was to hold legal title for financing purposes to assist her daughter and Mr. Day purchase a home together. [The Real Parties] paid the down-payment and have been paying the mortgage, taxes

22

and upkeep since Ms. Burry took legal title. Moreover, the Co-ownership Agreement reserves no possessory interest for Ms. Burry. [The Real Parties'] rights are exclusive. They are equivalent to a fee interest in the Property. As such, they are owners for purposes of Section 69.5."

The Board's decision was based on its conclusion that California law allowed the Real Parties to receive the benefit of the base-year value transfer from Day's previous residence under Revenue and Taxation Code section 69.5 because, as undisputed beneficial title holders, they overcame the presumption that Burry, as the record title owner, was the owner of the Property. In her writ petition, the Assessor argued the Board erred because Burry, not the Real Parties, held record title to the Property when it was purchased from the prior owner and obtained financing for it. Therefore, the Assessor contended, she must be considered the owner of the Property. Sustaining the Assessor's position, the trial court concluded Burry could not transfer beneficial interest in the Property to the Real Parties via the Agreement two days before her purchase of the Property because California law requires that she hold a present interest in real property in order to transfer it.

Here on appeal from the trial court's administrative writ, the Real Parties argue that the Board *did* base its decision on their agency theory, which they claim was fully litigated and is not only legally correct, but supported by substantial record evidence. Despite having granted writ relief without qualification in the face of the Real Parties' reliance on this theory—a theory they had pressed before the Board as well—the trial court skirted the issue. It took the view that the Board "did not address the agency argument in its decision" and instructed that "the matter shall be remanded for the Board to address this argument in light of this ruling." Without

23

deciding the agency issue ourselves, we note that there is California law that might provide support for the Real Parties' position,[2] while, on the other hand, not only is the Co-Ownership Agreement silent about whether anything in it constitutes an agency, but according to the Assessor, Burry affirmatively disclaimed being an agent in the Co-Ownership Agreement.[3]

Nonetheless, it is premature for us to decide whether the Real Parties should prevail on their agency theory for two reasons. First, while there are suggestions in the Board's decision, such as its reference to Burry assisting the Real Parties to purchase a home together, that it may have intended its decision to be based on the agency theory, that theory, as argued by the Real Parties, did not involve any transfer of beneficial ownership by Burry, which

---

[2] See Rev. & Tax. Code, § 60; Cal. Code Regs., tit. 18, § 462.001; *Kinert v. Wright* (1947) 81 Cal.App.2d 919, 924–927 (person who orally agreed to buy real property on behalf of another person with the other person's funds did so as agent of the other person even if the parties did not use that term and, upon purchase of the property, held title as trustee for that principal, who was the rightful owner of the property and beneficiary, and the agent was required to deliver the property to the principal); *Walter E. Heller Western, Inc. v. Bloxham* (1985) 176 Cal.App.3d 266, 270, fn. 2 (following *Kinert* to conclude that "attorneys' purchase [of real property] as Heller's agent created a resulting trust with the beneficial interest in Heller"); Civ. Code, § 2322 (an agent's authority does not allow him or her to violate the statutory duties of a trustee); *Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1319 ("Under general principles of trust law, trust beneficiaries hold 'an equitable estate or beneficial interest in' property held in trust and are ' "regarded as the real owner[s] of [that] property." ' "; "The trustee is ' "merely the depositary of the legal title" ' to the property [cite]; ' "the legal estate" ' the trustee holds ' "is . . . no more than the shadow . . . following the equitable estate . . . ." ' ").

[3] A clause in the Co-Ownership Agreement entitled "No Partnership" provides, inter alia, that "No party hereto or subsequent transferee is authorized to act as agent or on behalf of any other Party, . . . except as may be specifically provided in this Agreement."

24

the Board also concluded had occurred. The Board's decision is not clear enough for us to conclude one way or another if it is based on the Real Parties' agency theory.

Second, and just as importantly, this court raised a question at oral argument that must be developed legally and factually before the Board decides whether or not to rely on an agency theory in its ruling. That is, can or should the Co-Ownership Agreement be enforced as a matter of public policy in light of any representations by Burry to lenders that she owns and will occupy the Property "for her exclusive use and enjoyment," and will not transfer "any interest" in the Property to any third party absent the lender's written consent. Some of those representations are flatly inconsistent with the undisputed facts and some appear to have been inaccurate. So far as we can discern in the record, there is no evidence of any written waiver of them by the lender acknowledging Burry's actual role in the transaction or of it otherwise consenting to inconsistencies with her representations.

We do not have a view on whether, in fact, these were material representations that remained binding in the eyes of the lender when the Real Parties claim to have taken beneficial ownership, and if they did, what the legal consequences of Burry's statements may be. What we can say for now is that it is potentially problematic for a court to lend its imprimatur to a transaction in which a loan was obtained based on misrepresentations to the lender. We raise the matter of enforceability at this stage only to ensure that it is addressed as part of the Board's inquiry on remand from the trial court. We think it best for the Board to first clarify its ruling and fully address the Real Parties' agency argument before the issue is presented upon review by the trial court, or ultimately by us.

25

## III. DISPOSITION

We vacate the trial court's order and remand to the trial court with instructions that it issue an interlocutory writ directing the Board to (1) vacate its decision of July 13, 2023, and (2) conduct further proceedings consistent with this opinion, including but not necessarily limited to clarifying its previous decision and determining whether the Real Parties' agency theory is a valid basis for ruling in their favor. The Board's consideration of the Real Parties' agency theory should include a question about which we do not address and offer no opinion: Can or should the Co-Ownership Agreement be enforced as a matter of law or public policy in light of any later representations by Burry to lenders that she owns the Property?

Nothing in our opinion or the trial court's order is to prevent the Board from considering additional evidence and argument offered by the parties. The trial court shall maintain jurisdiction over this matter in the event either of the parties wishes to challenge any part of the Board's resulting decision before the trial court. (See, e.g., *County of Los Angeles*, *supra*, 22 Cal.App.5th at pp. 185–187 [trial court issued expressly interlocutory order to the commission so that any return after remand would come to the trial court].)

The parties are to bear their own costs of appeal.

STREETER, J.

WE CONCUR:

BROWN, P. J.
MOORMAN, J.*

---

* Judge of the Mendocino Superior Court, assigned by the Chief Justice, pursuant to article VI, section 6 of the California Constitution.

26